### MINNESOTA TRIBUNE CO. v. ASSOCIATED PRESS.

(Circuit Court, D. Minnesota. November 16, 1896.)

CONTRACTS—INTERPRETATION—PARTIES—NEWS ASSOCIATION SERVICE.

A newspaper company having an exclusive contract right in its locality to the news service of a press association, for publication in its own newspaper only, agreed to lease to a rival publication, for three years, the right to also receive the same service, and to cause the association's wires and operator to be placed in its office, so that the news reports might be delivered direct, provided the association would consent thereto. At a conference between the managers of the two newspapers and the manager of the association, the latter verbally agreed to comply with the arrangement, in consideration of an increase in the weekly payments, and thereupon the contract between the two newspapers was executed in writing by them. Pending the existence of this arrangement, a new news association was formed, with a by-law making eligible as members thereof, without the assent of its local board, newspapers which were entitled, on a given date, to receive service of news from the old association "under existing contracts." *Held*, that the second newspaper was within this description; that it was, at the date specified, receiving service from the old association, under a contract to which both were parties, namely, the contract arising from the verbal agreement of the managers.

This was a bill in equity by the Minnesota Tribune Company, a Minnesota corporation, against the Associated Press, a corporation organized under the laws of Illinois, to enjoin the alleged violation of a contract, and to recover damages for past violations.

The bill of complaint, omitting the merely formal parts, was as follows:

(1) That your orator is a citizen of the state of Minnesota, and a corporation duly organized, created, and existing under and by virtue of the laws of the said state

of Minnesota, with its principal office for the transaction of its business in the city of Minneapolis, in said state of Minnesota. That the defendant, the Associated Press, is a corporation duly created, organized, and existing under and by virtue of the laws of the state of Illinois, and has been such since the 13th day of December, 1892; and ever since the said 13th day of December, 1892, the said defendant has been, and still is, a citizen of the said state of Illinois.

(2) That your orator, for many years last past, and during all the times hereinafter stated, has been, and still is, the owner and engaged in the printing, publishing, and circulating of a daily morning newspaper, known as the "Minneapolis Tribune," at the city of Minneapolis, in the state of Minnesota. That your orator has derived great revenue from the publication and sale of said Minneapolis Tribune. That the circulation and sale of said Minneapolis Tribune is very large, and the said paper is of great value and worth to your orator. That the extent of the sale and circulation of the said Minneapolis Tribune depends entirely upon the character and quantity of the news and information, both domestic and foreign, that your orator is able to obtain and publish therein; and the value of your orator's said newspaper, and the extent of the sale and circulation of the same, depend upon whether or not your orator can obtain and publish such news and information exclusively in said paper, in the vicinity or locality in which said newspaper is issued and published. That, aside from the income derived from the sale of said newspaper, the value of said paper, and the income your orator derives from the publication, sale, and circulation thereof, depend entirely upon the amount of advertising matter your orator can obtain for insertion and publication in said newspaper. That the principal income derived from the publication of the said Minneapolis Tribune by your orator is from the advertising matter inserted and published therein. That the amount of advertising matter that your orator is able to obtain for insertion and publication in said newspaper, and the price that your orator receives therefor, depend almost entirely upon the extent to which your orator is able to sell and circulate said Minneapolis Tribune.

(3) That the defendant is engaged in the business of gathering and collecting news and information in all parts of the United States and foreign countries for publication, and in selling and supplying in various parts of the United States. That such news, when so gathered and collected and supplied to the publisher of a newspaper, is of great value to such publisher, especially if such publisher has the right to receive and publish the same exclusively in its paper in the locality or vicinity in which such newspaper is published and circulated; and that such news so gathered and collected is of especial value to your orator for the reason herein stated. That the only means by which your orator can obtain the news of the different states, and especially foreign news, is through this defendant, or such other news-gathering organizations or associations as may exist. That said defendant is the principal news-gathering association or organization in the United States, having agencies in every state in the Union, as well as in all the large cities of foreign countries. That a very large number of the newspapers in the United States rely, and your orator especially relies, and is dependent almost entirely, upon the said defendant for the gathering of news and information in, and furnishing the same from, all territory lying outside a radius of sixty miles from the city of Minneapolis.

(4) That prior to the making and execution of the contract hereinafter referred to between your orator and the said defendant, your orator received all of its news, from the territory lying outside a radius of sixty miles from the city of Minneapolis, from two news-gathering associations known as the "Western Associated Press" and the "United Press." That, after the defendant herein was organized as above alleged, your orator, at the time said contract hereinafter set forth was made, and at the special instance and request of said defendant, and relying upon the privileges granted to it by its contract with the said defendant, and the good faith of the said defendant in carrying out the same, ceased to do business with the said Western Associated Press, and ceased to receive any news or information from it. That, as your orator is informed and believes, and so alleges the fact to be, many of the newspapers in the Western states did likewise, and in consequence thereof the said Western Associated Press, at the time said contract was made, or shortly thereafter, went out of existence, and ceased to gather any news or information or to do any business. That after the making of the contract hereinafter set forth between your orator and the said defendant, and by virtue of and pur-

suant to the terms and conditions of said contract, said defendant, by its board of directors, on or about the 25th day of August, 1893, declared the said United Press antagonistic to the said defendant, within the meaning of the by-laws of said defendant, and thereupon duly notified and required your orator to cease receiving any news from, or furnishing any news to, the said United Press, as required by the terms and provisions of said contract between your orator and said defendant. That thereafter, relying upon the terms and conditions of said contract between your orator and the said defendant, and the good faith of the said defendant in carrying out the same, and pursuant to said notice and requirement of said defendant, your orator did cease to receive any news from the said United Press, or to furnish any news to it, as required and directed by the said defendant under the terms and provisions of said contract between it and your orator. That ever since your orator has been, and now is, dependent upon, and has almost entirely relied upon, said defendant for the supplying of news and information to your orator from all territory lying outside a radius of sixty miles from the said city of Minneapolis, as above alleged. That your orator has no right or authority to receive any news from the said United Press at the present time, nor has it had any such right or authority since directed, as aforesaid, by said defendant, to cease receiving news from or furnishing news to said United Press; and your orator cannot now, nor can it in the future, receive any news or information for publication from said United Press without forfeiting all its rights and privileges under the said contract between your orator and the said defendant. That the said United Press and the said defendant are the only news-gathering associations extensively engaged in that business in the United States.

(5) That the contract referred to between your orator and the said defendant was duly made and entered into by and between your orator and said defendant on the 2d day of March, 1893, a copy of which said contract is hereto attached, and marked "Exhibit A," and hereby made a part of this, your orator's bill of complaint; and your orator asks that it be considered and treated as a part of this, its bill of complaint. That by said contract, among other things, the said defendant sold and conveyed to your orator the right and privilege of publishing in the Minneapolis Tribune, Minnesota, the night news reports of the defendant for a term of ninety-two years, and the said defendant agreed to deliver the same to your orator in time for publication in said newspaper. Your orator agreed to receive said news reports from said defendant for the said period of ninety-two years, and to publish the same in said Minneapolis Tribune continuously, and to pay therefor ninety-four and 90-100 dollars per week in advance, and to pay any additional weekly assessment which the board of directors of said defendant or the executive committee thereof should make, not exceeding fifty per cent. of the primal sum agreed to be paid. That your orator agreed not to furnish any news, before publication, to any person or corporation engaged in the business of collecting news, except upon the written consent of the board of directors of said defendant; and your orator further agreed that it would not furnish to any person any of the news received by it from said defendant before publication; and your orator further agreed not to furnish its special or other news to, or receive any news from, any person or corporation which shall have been declared by the board of directors of said defendant antagonistic to said defendant, after having received notice of such declaration on the part of said defendant; and said defendant, on its part, agreed not to furnish any news reports to any newspaper to be published in the territory described in its said contract not then entitled to receive the same under the by-laws of said defendant without the written consent of your orator or its assigns. That from and since the execution of said contract between your orator and the said defendant, your orator has fully and completely carried out and observed all of the terms, provisions, and conditions of said contract by it to be carried out and observed, as required by the terms and provisions thereof.

(6) That, during all the times herein stated, the Journal Printing Company has been, and still is, a duly organized and existing corporation under and by virtue of the laws of the state of Minnesota, with its principal place of business in the city of Minneapolis, in said state. That, among other things, the Journal Printing Company has been, prior to and since the 27th day of September, 1894, the owner of, and engaged in printing, publishing, and circulating, at the said city of Minneapolis, a daily morning newspaper known as the "Minneapolis Times." That the said Minneapolis Times is printed, published, and circulated at the same time,

and in the same territory, as the said Minneapolis Tribune, and is a direct competitor of the said Minneapolis Tribune; and the said Journal Printing Company, through the said Minneapolis Times, has been, and still is, attempting to interfere with and supplant the sale and circulation of the said Minneapolis Tribune among the newspaper-reading public in the territory where the said Minneapolis Tribune is sold and circulated. That ever since on or about the 27th day of September, 1894, the said defendant, in direct violation of your orator's rights, and disregarding its obligations to your orator under said contract, has sold and furnished to the said Journal Printing Company all of its night news reports, being the same news reports and information which it had contracted and agreed to furnish exclusively to your orator under and by virtue of the terms and provisions of said contract between your orator and the said defendant; and the said Journal Printing Company has received the said night news reports, and all of the same, from the said defendant, and published all of the same in the Minneapolis Times,—all of which has been done by the said defendant without the consent of your orator, either written or otherwise, and notwithstanding your orator's earnest protests and requests to the contrary; and the said defendant threatens and states that it will continue to furnish the same in the future, as it has done for several weeks last past, to the said Journal Printing Company for publication and circulation in said Minneapolis Times.

(7) That a true and correct copy of all of the by-laws of said defendant, relating to or regulating what newspapers or publishers of newspapers were entitled to receive the said news reports at the time of the making of said contract or since, is set forth in "Exhibit B," hereto attached and made a part of this, your orator's bill of complaint; and your orator asks that the same be considered and treated as a part of this, its said bill of complaint. That the said Journal Printing Company, or the said Minneapolis Times, was not at the time of the making of said contract between your orator and the said defendant, nor has either since been, nor is either at the present time, entitled to receive the said night news reports under and by virtue of the terms and provisions of said contract between your orator and the said defendant, or under the by-laws of said defendant; and that your orator, at the time of making said contract, was, ever since has been, and still is a member of the local board referred to in said by-laws for the territory covered by said contract. That the Minneapolis Tribune, referred to in said contract between your orator and the said defendant, is the same Minneapolis Tribune referred to in this, your orator's bill of complaint, as being owned and published by your orator at the said city of Minneapolis.

(8) That by reason of the wrongful acts of the said defendant, and the violation on the part of the defendant of the terms and provisions of the said contract, your orator and the said defendant, as above alleged, the said property of your orator, to wit, said newspaper, has been, and will in the future be, greatly and irreparably injured, its circulation and sale greatly and irreparably impaired, and the amount of advertising matter which your orator can obtain for insertion and publication in said Minneapolis Tribune, and the price your orator can obtain therefor, has been, and in the future will be, greatly and irreparably interfered with and damaged. That your orator has already and will in the future sustain irreparable damage and loss, and its said property, to wit, the said Minneapolis Tribune, will be greatly and irreparably damaged, by reason of the wrongful acts aforesaid of said defendant.

Wherefore, your orator prays that this honorable court may order, direct, and decree that a writ of injunction issue out of and under the seals of this court, enjoining and restraining the said defendant, and each and all of its officers, servants, agents, and employés, during the term of said contract, from furnishing the said night news reports of said defendant to the said Journal Printing Company for publication in the said Minneapolis Times, or in any other morning newspaper published within the territory described in said contract, and from any further violation of said contract in the manner herein set forth, and requiring and directing the said defendant to fully carry out and comply with the terms and conditions of the same; and your orator further prays that, upon the rendering of the decree above prayed, the court assess, or cause to be assessed, the damages your orator has sustained, in so far as the same are ascertainable, by reason of the violation of said contract, up to the time of rendering such decree; and your orator.

prays that it may have such other and further relief in the premises as to the court may seem just and equitable.

The agreement between the Minnesota Tribune Company and the Associated Press, which was marked "Exhibit A," and by reference made part of the bill of complaint, was as follows:

### Exhibit A.

Series A. This agreement, made and entered into this second day of March, 1893, by and between The Associated Press, the party of the first part, and The Minnesota Tribune Company, the party of the second part, witnesseth, that, for and in consideration of the covenants herein contained, the parties hereto have mutually agreed as follows: (1) The party of the first part hereby sells and conveys to the party of the second part the right and privilege of publishing in the Minneapolis Tribune, a newspaper printed in the English language at Minneapolis, Minn., the night news report of the Associated Press for the term of ninety-two years, and to deliver to said party of the second part, in time for publication in said newspaper, the said report, so far as it may be practicable so to do. (2) Said party of the second part agrees to receive the said news report of said party of the first part for said term of ninety-two years, and to publish the same in said newspaper continuously, and to pay therefor ninety-four and 90-100 dollars per week in advance, and also to pay any additional weekly assessments made by the board of directors or executive committee of said first party upon said party of the second part, not exceeding fifty per cent. (50%) of the amount above agreed to be paid weekly, in like weekly installments in advance. (3) Said party of the second part agrees to furnish to the party of the first part the news, local and telegraphic, of the following described territory, viz.: Within a radius of sixty miles from said city, excepting the city of St. Paul and such territory adjacent thereto as is covered by the franchise rights of the members of said city, in accordance with the provisions and requirements of section one of article eleven of the by-laws of said party of the first part. (4) It is mutually understood and agreed that the board of directors of said party of the first part shall have the right and power to change, from time to time, the weekly assessments to be paid by said party of the second part for the news report hereinbefore mentioned, without limit as to amount, and that said party of the second part shall pay the amount of said weekly assessment so long as it takes said news report. In the event that said weekly assessment shall be increased more than fifty per cent. (50%) above the weekly amount specified and agreed to be paid by said second party at the date of this contract, then and in such case said second party shall have the right to terminate this contract, and all liabilities thereunder, upon the transfer and surrender to said first party of all of his stock in said Associated Press, for which he shall be entitled to receive from said first party the par value thereof. (5) It is further mutually agreed between the parties hereto that the franchise or privilege granted by this contract to said party of the second part may be transferred with the said Minneapolis Tribune newspaper, provided the new proprietor shall enter into a new contract with said party of the first part similar hereto. (6) Said party of the second part covenants and agrees that it will not furnish, before publication, any news to any person or corporation engaged in the business of collecting or transmitting news, except upon the written consent of the board of directors of the party of the first part had and obtained; and that it will not furnish to any person any of the news received by it under this contract before publication by it; and that it will not furnish its special or other news to, or receive news from, any person or corporation which shall have been declared by the board of directors of said party of the first part antagonistic to said party of the first part, after having received notice of such declaration. (7) It is further mutually agreed between the parties hereto that the rights, duties, and obligations of the respective parties hereto, except as hereinbefore specifically provided for, shall be controlled and governed by the by-laws of said party of the first part now or hereafter in force during the life of this contract; and that the right to receive news under this contract may be suspended or terminated in the manner and for the causes specified in said by-laws. (8) It is further stipulated and agreed that said party of the first part shall in no event be liable for any loss or damage arising to said party of the second part by rea-

son of the publication of any of the news received by it from said party of the first part under this contract. It is agreed that the word "person," in this contract, includes any partnership, corporation, association, newspaper, or agency. (9) Said party of the first part promises and agrees not to furnish any news reports to any newspaper published in the said territory described in this contract, not now entitled to receive the same under the by-laws of said party of the first part, without the written consent of the said party of the second part or its assigns. (10). Said party of the second part has assigned and transferred its stock to said party of the first part to the said party of the first part, which stock is to be held by said party of the first part as security for the performance by said party of the second part of this contract on its part. Said party of the second part, in consideration of the making of this contract by said party of the first part, hereby covenants and agrees that it will not sell or part with any interest in said stock to any party who shall not be the proprietor of a newspaper which shall at the time be on the membership roll of said party of the first part; and that it will keep and observe and perform all the requirements of the by-laws of said party of the first part now or hereafter in force during the life of this contract.

The by-laws of the Associated Press affecting the rights of the parties, and which were referred to in the bill as "Exhibit B," were in the following language:

Exhibit B.

By-Laws (of the Associated Press) Relating to Members.

VI. Membership.

(1) Who are Members. The proprietors of the newspapers receiving the news report of the Associated Press shall constitute its membership, and be designated as "Members of the Associated Press."

(2) Membership Roll. The secretary of the company shall keep a record of all newspapers entitled to a news report from the association, to be known as the "Membership Roll," and no service of news shall be rendered to any newspaper until it shall have been properly enrolled.

(3) Who are Eligible. Memberships shall not be confined to newspaper proprietors who are the owners of stock, but may be issued without regard thereto, to any newspaper proprietor, in accordance with the terms and conditions provided in these by-laws.

VII. Admission of Members.

(1) How Admitted. Application for admission to be a member of this association shall be made by a communication in writing addressed to the board of directors, and signed by the proprietor of the newspaper for which the news report is desired. The application shall be accompanied by the consent in writing of all persons whose consent is necessary, under the by-laws, to authorize the board to grant the application. Applications may be acted upon at any meeting of the board of directors or the executive committee, the affirmative vote of a majority of those present being necessary to elect.

(2) Consent of Local Board. No new member shall be admitted except in accordance with the provisions of the by-laws relating to local boards, where publication is proposed in a city or town having at the time one or more members holding certificates of Series A. Newspapers which were entitled to a service of news under existing contracts with the Western Associated Press or the United Press on the 15th day of October, 1892, shall not be considered new members, within the meaning of this article.

(3) Membership Contract. Every member shall be required to execute a contract with the association before the name of the newspaper of which the member is proprietor shall be entered upon the membership roll. The form of this contract shall be prescribed by the board of directors, and it shall conform to the requirements of the by-laws, embodying the substance of their provisions respecting the rights and duties of members.

(4) Stock Deposit to Secure Contract. Each membership contract shall obligate the member to deposit with the treasurer of the company all shares of the stock of the company of which he shall be the owner, or shall become the owner at any

time, to be held as security to insure the proper performance of all the covenants of the contract.

### VIII. Certificates of Membership.

(1) Form of Certificate. The evidence of membership shall be a certificate signed by the president and secretary of the Associated Press, and bearing its seal. It shall set forth the language in which the newspaper admitted as a member shall be printed. It shall state whether the newspaper is a morning or afternoon paper, and the place of its publication. It shall entitle the holder to receive for publication in the newspaper named a day or night report, as may be specified, upon payment of a weekly toll, to be fixed from time to time by the Associated Press, acting through its board of directors. Certificates shall be issued in two classes, to be designated "Series A," and "Series B," and shall state the substance of the franchise obligations included in the contract of the member as provided in these by-laws.

(2) Series A. The holder of a certificate of membership of Series A shall be entitled to receive the news report provided for in his contract, and no new membership shall be created in his city, or such additional territory contiguous thereto as may be specified in his contract, without the consent in writing of all the holders of certificates of Series A in such city and additional territory, except as may be otherwise provided in these by-laws.

(3) Series B. The holder of a certificate of membership of Series B shall be entitled to the report specified in said certificate, and shall not be deprived of the same, except as may be provided in these by-laws. It shall not carry with it any exclusive or restrictive privileges whatsoever, except as provided by specific contract otherwise; and its sole object shall be to establish the fact that the newspaper holding it is a member of the Associated Press, entitled to receive the specified service upon payment of the weekly toll fixed from time to time by the association through its board of directors.

### IX. Rights and Privileges of Members.

(2) Hours of Publication. Morning papers shall be entitled to all dispatches received in any office of the Associated Press before 5 a. m., standard time, with the privilege of publication between 11 p. m. and 11 a. m., standard time; and afternoon papers shall be entitled to all dispatches received in any office of the Associated Press before 4 p. m., standard time, with the privilege of publication between 11 a. m. and 11 p. m., standard time: provided, the board of directors may authorize the issue of extra editions outside of the hours named upon extraordinary occasions.

### X. Local Boards.

(1) Charter. In every city where there shall be more than one member holding a membership certificate of Series A, as heretofore provided for in by-law VIII., there shall be a local board acting under a charter issued by the board of directors of the association, which shall be signed by the president and secretary, and bear the seal of the company.

(2) Composition and Power. Every member in such city, holding a certificate of Series A, shall be entitled to a representation and one vote at all meetings of the local board, and no new membership shall be issued authorizing the publication of the news of the association in any city without the unanimous consent in writing of the members of the local board in that city.

(5) Where Only One Member. In any city where there shall be only one member holding a certificate of Series A, such member shall have and exercise all the powers and privileges of a local board under any of the by-laws.

Munn, Boyeson & Thygeson, for complainant.
W. D. Cornish, for defendant.

LOCHREN, District Judge. The above-entitled cause came on regularly for hearing upon the pleadings and evidence, at the court room in the federal building at St. Paul in said district, on Saturday, the 3d day of October, A. D. 1896, in the June, 1896, general

term of said court in said Third division of said district, and the complainant and defendant appeared by their respective counsel and were heard. From the admissions in the pleadings, and the evidence presented, it appears: That all the allegations contained in the subdivisions numbered 1, 2, 3, 4, and 5 of complainant's bill of complaint are true, as therein stated and set forth. That Exhibit A, attached to said bill of complaint, is a true and correct copy of the contract entered into between the complainant and defendant on the 2d day of March, 1893, and still in force; and that Exhibit B, attached to said bill of complaint, is a true and correct copy of all the by-laws of the defendant relating to or regulating what newspapers or publishers of newspapers were entitled to receive the news reports, furnished by the defendant, at the time of making said contract, and at all times since and hitherto. That the Journal Printing Company is, and at all times stated in said pleadings has been, a duly-organized Minnesota corporation, with its principal place of business in the city of Minneapolis, in said state; and that since the 1st day of July, 1894, it has, among other business, been the owner of, and engaged in printing, publishing, and circulating in said city of Minneapolis, a daily morning newspaper, known as the "Minneapolis Times," which is printed, published, and circulated at the same time, and in the same territory, as is the complainant's daily morning newspaper, the Minneapolis Tribune, and is a direct competitor with said Minneapolis Tribune, for sale, subscription, and advertising. That on the 27th day of September, 1894, the said defendant, without the written or other consent of said complainant, and against its objection and protest, entered into a written contract with the Journal Printing Company aforesaid, of that date, whereby, for the tolls and other considerations stated therein, said defendant contracted and agreed, for the term of 90 years thereafter, to grant and furnish to said Journal Printing Company, for publication in said Minneapolis Times, the night news reports of said defendant, and to deliver the same to said Journal Printing Company in time for daily publication in said Minneapolis Times; and that under such contract, and ever since the date thereof, said defendant has sold, furnished, and delivered to said Journal Printing Company all its nightly news reports for publication in said Minneapolis Times, and that the same has been published in said Minneapolis Times as so furnished; and that said defendant purposes and intends to continue to sell, furnish, and deliver its night news reports to said Journal Printing Company, under such contract, for such purposes. That on the 2d day of March, 1893, neither the Minneapolis Times nor the Minneapolis Times Company, a Minnesota corporation then owning and publishing said Minneapolis Times, was a member of the defendant corporation, or had then any contract with the defendant for the furnishing of any news by the defendant for publication in the Minneapolis Times. That during and prior to the month of June, 1891, and before the corporate existence of said defendant, two other district corporations, commonly called the United Press

and the Western Associated Press, were respectively engaged in the business of gathering and collecting news and information in the United States and elsewhere, and in selling and furnishing the same to newspapers, and the proprietors of newspapers, for publication. That the complainant was in June, 1891, a member of, and had contracts with, each of said two last-named corporations, by which contract the complainant was entitled to have, exclusively, in the said city of Minneapolis, the night news reports of each of the same corporations for publication. That by the terms of complainant's contract with the United Press aforesaid, the said United Press contracted to furnish its night news reports to the complainant for publication in the morning in the complainant's newspaper, the Tribune, and for no other purpose, subject to the by-laws of the United Press, and that it (the United Press) would not render the same service, for publication in the English language, in said Minneapolis, without the consent of the complainant. Such contract also provided that the complainant's rights thereunder might be sold with complainant's said newspaper, but that it could not be otherwise transferred without the consent of the United Press indorsed upon said contract. The particular terms of complainant's contract with said Western Associated Press do not appear, but the complainant's right to its night news reports for publication in said city were exclusive. That in the month of June, 1891, the Minneapolis Times Company, a Minnesota corporation, being then engaged or about to engage in the publication, in said city of Minneapolis, of the Minneapolis Times, as a daily morning newspaper, in the English language, entered into negotiations with said complainant for the obtaining of the night news reports of said United Press and said Western Associated Press for publication in said Minneapolis Times; and that it was thereupon agreed between said Minneapolis Times Company and said complainant that, in case the said United Press and Western Associated Press would severally consent thereto, the said complainant would let and lease to said Minneapolis Times Company the right, franchise, and privilege to have and receive the night news reports of said United Press and said Western Associated Press, received in the usual course of business, at said city of Minneapolis, for the publication thereof in said Minneapolis Times, and for no other use or purpose, for the term of three years from the 1st day of July, 1891, and would, without expense to said Minneapolis Times Company, cause said United Press Company to place and maintain during said term, in the office of said Minneapolis Times Company in said city of Minneapolis, such wires, telegraphic instruments, and telegraph operators as said United Press should deem adequate to receive and transcribe such news reports sent by it to said city of Minneapolis, and that said complainant would also furnish during such term, to the Minneapolis Times Company, for publication in said Minneapolis Times, copies of said night news reports of the Western Associated Press; that in consideration thereof the Minneapolis Times Company would pay said complainant $3,600 per

year in semiannual payments, and also, in weekly payments, one-half of the weekly tolls which said complainant would have to pay to said United Press and said Western Associated Press for their service, respectively, of such news reports. That said Western Associated Press at once, on complainant's request, consented to such proposed contract between the complainant and said Minneapolis Times Company; and that upon a conference between the manager of the complainant, the manager of the Minneapolis Times Company and the Western manager of said United Press, had at Chicago, just prior to June 21, 1891, the said United Press, in consideration that its weekly tolls for sending such news reports should be increased the sum of $15 per week, also assented to said proposed contract, and agreed that said United Press would conform thereto; and that thereupon, on the 29th day of June, 1891, the said complainant and said Minneapolis Times Company caused the said proposed contract to be reduced to writing, with other stipulations therein contained, needless to be referred to herein, and duly executed and mutually delivered the same, in duplicate; and that said United Press thereupon removed its wires, telegraphic instruments, and telegraph operators to the office of the Minneapolis Times Company, and from the 1st day of July, 1891, increased its tolls $15 per week for its news reports so furnished; and that thereafter, and until September, 1893, the Minneapolis Times Company continued to receive such night news reports, directly from the United Press, and by copy from the complainant from the Western Associated Press, and to publish the same daily in said Minneapolis Times newspaper, and that said Minneapolis Times Company performed said contract with complainant, in all things on its part, during the same time. That on or about July 1, 1894, the said Minneapolis Times Company sold and delivered the Minneapolis Times newspaper, and all the property, rights, franchises, and contracts connected therewith and with the publication thereof, to the said Journal Printing Company, which has since been the owner of the same, and the proprietor of said Minneapolis Times newspaper.

As the complainant, on March 2, 1893, became a member of the defendant under its contract or certificate of membership of that date of the kind denominated "Series A," and was then the only member of defendant entitled to receive its night news reports in the city of Minneapolis, and no other person or corporation had then any contract with defendant for the reception of its night news reports in that city, the defendant, by the terms of its contract with the complainant, and by the terms of its by-laws, had no right thereafter, without the written consent of the complainant, to admit the Journal Printing Company as a member entitled to receive the defendant's night news reports in said city, for publication in the Minneapolis Times, unless, and within the purview of section 2 of article VII. of defendant's by-laws, the Minneapolis Times was a newspaper which was "entitled to a service of news under existing contracts with the Western Associated Press or the United Press on the 15th day of October, 1892." If the Minne-

apolis Times was, on October 15, 1892, under existing contracts with the Western Associated Press or with the United Press, entitled to a service of news, its proprietors might, after March 2, 1893, apply for and be eligible to membership in the defendant corporation, entitled to its news reports, without being considered a new member, and without the consent of the complainant. The evidence shows that the Minneapolis Times was on October 15, 1892, under existing contracts, entitled to receive, and was receiving, service of news from the Western Associated Press and from the United Press. But its proprietor had no contract for such service with the Western Associated Press, and received the news of that corporation from the complainant, who was, by the Western Associated Press, admitted to have the right to so dispose of such news after its reception by complainant. Such news was therefore served to the Minneapolis Times by the complainant, and not by the Western Associated Press. But the contract of complainant with the United Press shows that complainant had no such right to dispose of the night news reports of the United Press. Its right was to receive such night news reports for publication in its newspaper, the Tribune, "and for no other purpose whatever." Such news could not, therefore, be furnished to the Minneapolis Times without a new or additional contract with the United Press, having at least the effect of removing that restriction upon the use of the news received by the complainant from the United Press. The complainant contends that such alone was the effect of the verbal agreement made with the United Press, through its Western manager, in June, 1891; that such verbal agreement was between the complainant and the United Press alone, as parties to it, although the manager of the Minneapolis Times, representing its proprietor, was present at the negotiation, and interested in its consummation; and that such verbal agreement merely waived the above-quoted restriction so far as to permit the complainant to furnish to the Minneapolis Times for publication the news reports received by complainant from the United Press. I am unable, upon the evidence, to agree with this contention. At this meeting in June, 1891, of the managers of the complainant and of the Minneapolis Times Company with the Western manager of the United Press, the proposed contract to be entered into between the complainant and the Minneapolis Times Company, as then negotiated, and as afterwards reduced to writing and executed, was made known to such manager of the United Press, involving, as it did, the moving by the United Press of its wires, telegraphic instruments, and telegraph operators into the office of the Minneapolis Times, and the sending of its night news reports, by the United Press, to the Minneapolis Times, for publication in that newspaper as well as in complainant's newspaper, for the term of three years. The complainant and the Minneapolis Times Company were both interested in having the United Press agree to this, and agree to perform the stipulations and acts to be performed by it, as indicated in such proposed contract, upon such terms and for such con-

sideration as they could accede to. Without this the then proposed contract between the complainant and the Minneapolis Times Company could not be consummated. The United Press did then agree to perform the acts, and render the service, so contemplated in said proposed contract to be done and performed by it, for the consideration that the weekly tolls to be paid it for such night news reports should be increased $15 per week above what the complainant had been paying for such reports. One-half of such additional consideration was, as all the parties then understood, to be paid by the Minneapolis Times Company. This verbal contract was carried out by the several parties, and was in force and being performed on October 15, 1892, and long after; and under it, as an existing contract, the Minneapolis Times was at that date receiving, and entitled to receive, from the United Press directly, a service of its news daily, for publication in said Minneapolis Times. It seems to me, from the evidence, that the Minneapolis Times Company must be regarded as a party to that verbal contract with the United Press. Its manager was present, and interested in its negotiation. It was for the benefit of the Minneapolis Times Company as well as of the complainant. It was to be performed directly with the Minneapolis Times Company, which was to pay one-half of the consideration which the United Press was to receive for the performance on its part of such verbal contract. If the manager of the Minneapolis times Company said not a word in that conference, it made no difference, as his silence would, under the circumstances, be an assent, on behalf of his principal, to what was concluded and agreed to, for his dissent would have ended the negotiation. His silent participation was as effectual to affect his principal as if he had personally discussed every stipulation; and his principal ratified the agreement by taking subsequent action to put it in force, and in its performance. It is not necessary, therefore, to consider in this case the very questionable doctrine asserted by some courts, to the effect that a stranger to a contract and to its consideration may enforce it, where its performance would be, and was intended to be, for his direct benefit. My conclusion is that the defendant had the right, without complainant's consent, to make the contract of September 27, 1894, with the Journal Printing Company, and to furnish, under such contract, its night news reports for publication in the Minneapolis Times. The bill of complaint in this case should be dismissed upon the merits, with costs. A formal decree may be prepared in accordance with this opinion, and submitted for settlement.