### MINNESOTA TRIBUNE CO. v. ASSOCIATED PRESS.[1]

(Circuit Court of Appeals, Eighth Circuit. November 22, 1897.)

#### No. 906.

1. CONSTRUCTION OF CONTRACTS—REFERENCE TO BY-LAWS—NEWS-ASSOCIATION SERVICE.

A contract between an association engaged in furnishing news, and a certain newspaper company, provided, in its seventh paragraph, "that the rights, duties, and obligations of the parties hereto, except as hereinbefore specifically provided for, shall be controlled and governed by the by-laws of the said party of the first part," etc. *Held*, that the effect of this was to make the subsequent provisions of the contract subordinate to the by-laws, so that the ninth paragraph, which provided that the news association should not extend its news service to any publications not then entitled to receive the same, without the written consent of the other contracting party, was controlled and modified by a provision of the by-laws which provided that newspapers entitled to receive news service from certain old associations on a given date should be entitled to have service extended to them without the consent of the local members.

2. SAME.

A newspaper company, having an exclusive contract right in its locality to the news service of a press association, agreed to lease to a rival publication, for three years, the right to receive the same service, provided the association would assent thereto. At a conference between the managers of the two newspapers and the manager of the association, the latter verbally agreed to comply with the arrangement, in consideration of an increase in the weekly payments. Thereupon the agreement between the two newspapers was executed in writing by them, and the association's wires and operator were placed in the office of the second newspaper, so that the news reports were delivered direct to it. Pending the existence of this arrangement, a new news association was formed, with a by-law making eligible as members thereof, without the assent of its local board, newspapers which were entitled on a given date to receive service of news from the old association "under existing contracts." *Held*, that the second newspaper was within this description, and was entitled to have the news service of the new association extended to it without the consent of the other newspaper company, which, being at the time the only one receiving news from the new association, had all the powers of a local board. 77 Fed. 354, affirmed.

3. SPECIFIC PERFORMANCE—AMBIGUOUS CONTRACTS.

A suit for specific performance can only be maintained where the terms of the contract are so precise that they cannot be reasonably misunderstood; and specific performance will not be granted to enforce an agreement if any of its provisions are so far indefinite or ambiguous as to render it uncertain what were the intentions of the parties, and what obligations they intended to assume.

Appeal from the Circuit Court of the United States for the District of Minnesota.

This was a bill filed by the Minnesota Tribune Company, the appellant, against the Associated Press, the appellee, to specifically enforce the provisions of a contract between said parties, which contract was as follows:

"This agreement, made and entered into this 2nd day of March, 1893, by and between the Associated Press, the party of the first part, and the Minnesota

[1] Rehearing pending.

Tribune Company, the party of the second part, witnesseth: That, for and in consideration of the covenants herein contained, the parties hereto have mutually agreed as follows: 1st. The party of the first part hereby sells and conveys to the party of the second part the right and privilege of publishing in the Minneapolis Tribune, a newspaper printed in the English language at Minneapolis, Minn., the night news report of the Associated Press, for the term of ninety-two years, and to deliver to said party of the second part, in time for publication in said newspaper, the said report, so far as it may be practicable so to do. 2d. Said party of the second part agrees to receive the said news report of said party of the first part for said term of ninety-two years, and to publish the same in said newspaper continuously, and to pay therefor ninety-four and $90/100$ dollars per week, in advance, and also to pay any additional weekly assessments made by the board of directors or executive committee of said first party upon said party of the second part, not exceeding fifty per cent. * * * of the amount agreed to be paid weekly, in like weekly installments, in advance. 3d. Said party of the second part agrees to furnish to the party of the first part the news, local and telegraphic, of the following described territory, viz. within a radius of sixty miles from said city, excepting the city of St. Paul, and such territory adjacent thereto as is covered by the franchise rights of the members of said city, in accordance with the provisions and requirements of section one of article eleven of the by-laws of said party of the first part. 4th. It is mutually understood and agreed that the board of directors of said party of the first part shall have the right and power to change from time to time the weekly assessment to be paid by said party of the second part for the news report hereinbefore mentioned, without limit as to the amount, and that said party of the second part shall pay the amount of said weekly assessment so long as it takes said news report. In the event that said weekly assessment should be increased more than fifty per cent. * * * above the weekly amount specified and agreed to be paid by said second party at the date of this contract, then and in such case said second party shall have the right to terminate this contract, and all liabilities thereunder, upon the transfer and surrender to said first party of all his stock in said Associated Press, for which he shall be entitled to receive from said first party the par value thereof. 5th. It is further mutually agreed between the parties hereto that the franchise or privilege granted by this contract to said party of the second part may be transferred with the said Minneapolis Tribune newspaper, provided the new proprietor shall enter into a new contract with said party of the first part similar hereto. 6th. Said party of the second part covenants and agrees that it will not furnish, before publication, any news, to any person or corporation engaged in the business of collecting or transmitting news, except upon the written consent of the board of directors of the party of the first part, first had and obtained, and that it will not furnish to any person any of the news received by it under this contract before publication by it, and that it will not furnish its special or other news to, or receive news from, any person or corporation which shall have been declared by the board of directors of said party of the first part antagonistic to said party of the first part, after having received notice of such declaration. 7th. It is further mutually agreed between the parties hereto that the rights, duties, and obligations of the respective parties hereto, except as hereinbefore specifically provided for, shall be controlled and governed by the by-laws of said party of the first part now or hereafter in force during the life of this contract, and that the right to receive news under this contract may be suspended or terminated in the manner and for the causes specified in said by-laws. 8th. It is further stipulated and agreed that said party of the first part shall in no event be liable for any loss or damage arising to said party of the second part by reason of the publication of any of the news received by it from said party of the first part under this contract. It is agreed that the word 'person,' in this contract, includes any partnership, corporation, association, newspaper, or agency. 9th. Said party of the first part promises and agrees not to furnish any news report to any newspaper, published in the said territory described in this contract, not now entitled to receive the same under the by-laws of said party of the first part, without the written consent of the said party of the second part or its assigns. 10th. Said party of the second part has assigned and transferred its stock in the said party of the first part to the said party of the first part, which

stock is to be held by said party of the first part as security for the performance by said party of the second part of this contract on its part. Said party of the second part, in consideration of the making of this contract by said party of the first part, hereby covenants and agrees that it will not sell or part with any interest in said stock to any party who shall not be the proprietor of a newspaper which shall at the time be on the membership roll of said party of the first part, and that it will keep and observe and perform all the requirements of the by-laws of said party of the first part now or hereafter in force during the life of this contract."

The material portions of the by-laws of the Associated Press to which reference is made in the aforesaid contract were as follows:

"VI. Membership.

"(1) Who are Members. The proprietors of the newspapers receiving the news report of the Associated Press shall constitute its membership, and be designated as 'Members of the Associated Press.'

"(2) Membership Roll. The secretary of the company shall keep a record of all newspapers entitled to a news report from the association, to be known as the 'Membership Roll,' and no service of news shall be rendered to any newspaper until it shall have been properly enrolled.

"(3) Who are Eligible. Memberships shall not be confined to newspaper proprietors who are the owners of stock, but may be issued, without regard thereto, to any newspaper proprietor, in accordance with the terms and conditions provided in these by-laws.

"VII. Admission of Members.

"(1) How Admitted. Application for admission to be a member of this association shall be made by a communication in writing addressed to the board of directors, and signed by the proprietor of the newspaper for which the news report is desired. The application shall be accompanied by the consent in writing of all persons whose consent is necessary, under the by-laws, to authorize the board to grant the application. Applications may be acted upon at any meeting of the board of directors or the executive committee, the affirmative vote of a majority [of] those present being necessary to elect.

"(2) Consent of Local Board. No new member shall be admitted, except in accordance with the provisions of the by-laws relating to local boards, where publication is proposed in a city or town having at the time one or more members holding certificates of series A. Newspapers which were entitled to a service of news under existing contracts with the Western Associated Press or the United Press on the 15th day of October, 1892, shall not be considered new members, within the meaning of this article.

"(3) Membership Contract. Every member shall be required to execute a contract with the association before the name of the newspaper of which the member is proprietor shall be entered upon the membership roll. The form of this contract shall be prescribed by the board of directors, and it shall conform to the requirements of the by-laws, embodying the substance of their provisions respecting the rights and duties of members.

"VIII. Certificate of Membership.

"(1) Form of Certificate. The evidence of membership shall be a certificate signed by the president and secretary of the Associated Press, and bearing its seal. It shall set forth the language in which the newspaper admitted as a member shall be printed. It shall state whether the newspaper is a morning or afternoon paper, and the place of its publication. It shall entitle the holder to receive for publication in the newspaper named a day or night report, as may be specified, upon payment of a weekly toll, to be fixed from time to time by the Associated Press, acting through its board of directors. Certificates shall be issued in two classes, to be designated 'Series A' and 'Series B,' and shall state the substance of the franchise obligations included in the contract of the member as provided in these by-laws.

"Series A.

"(2) The holder of a certificate of membership of series A shall be entitled to receive the news report provided for in his contract, and no new membership

shall be created in his city, or such additional territory contiguous thereto as may be specified in his contract, without the consent in writing of all the holders of certificates of series A in such city and additional territory, except as may be otherwise provided in these by-laws.  *  *  *

### "X. Local Boards.

"(1) Charter. In every city where there shall be more than one member holding a membership certificate of series A, as heretofore provided for,  *  *  * there shall be a local board, acting under a charter issued by the board of directors of the association, which shall be signed by the president and secretary, and bear the seal, of the company.

"(2) Composition and Power. Every member in such city holding a certificate of series A shall be entitled to a representation and one vote at all meetings of the local board, and no new membership shall be issued, authorizing the publication of the news of the association, in any city, without the unanimous consent in writing of the members of the local board in that city."

"(5) Where Only One Member. In any city where there shall be only one member holding a certificate of series A, such member shall have and exercise all the powers and privileges of a local board under any of the by-laws."

For some years prior to the date of the aforesaid contract, to wit, March 2, 1893, the Minnesota Tribune Company was the owner of, and had been engaged in publishing, a newspaper in the city of Minneapolis which was known as the "Minneapolis Tribune"; and during such time it had received its news reports from two news-gathering associations, known, respectively, as the "United Press" and the "Western Associated Press," under contracts with said associations. On June 29, 1891, the Minneapolis Times Company, which was a corporation under the laws of the state of Minnesota, was engaged in publishing a morning newspaper in the city of Minneapolis known as the "Minneapolis Times." On the day last mentioned the Minneapolis Times Company, entered into a contract with the Minnesota Tribune Company whereby the former company agreed to purchase from the latter company copies of the news reports of said United Press and said Western Associated Press for a period of three years, and to pay therefor about $8,280 per year, which said contract was in force on the 15th day of October, 1892. On, or about July 1, 1894, the Minneapolis Times Company sold its newspaper and subscription list, and all of its rights, franchises, and good will, to the Journal Printing Company, a Minnesota corporation, which thereby became the successor of the Minneapolis Times Company, and the publisher of the Minneapolis Times. The bill of complaint which was filed herein charged, in substance, that the paper known as the "Minneapolis Times" was a morning newspaper, and a rival in business of the Minneapolis Tribune; that since September 27, 1894, the defendant below, the Associated Press, in utter disregard of its aforesaid contract with the Minnesota Tribune Company, had sold and furnished to said Journal Printing Company, for publication in the Minneapolis Times, all of its night news reports and information, which it had contracted and agreed to furnish exclusively to the Minnesota Tribune Company; and that such news reports had been so furnished to the Journal Printing Company notwithstanding the appellant's earnest protests and requests to the contrary. In view of the premises the bill prayed that the Associated Press, the appellee herein, might be enjoined and restrained, during the existence of the aforesaid contract, from furnishing said night news reports to said Journal Printing Company for publication in the Minneapolis Times, or to any other morning newspaper published within the territory described in said contract. The circuit court, on final hearing, refused said injunction, and dismissed the bill of complaint (77 Fed. 354), from which decree the complainant below has appealed.

M. D. Munn (N. M. Thygeson, on the brief), for appellant.

Emanuel Cohen (William D. Cornish and John P. Wilson, on the brief), for appellee.

Before BREWER, Circuit Justice, THAYER, Circuit Judge, and RINER, District Judge.

THAYER, Circuit Judge, after stating the case as above, delivered the opinion of the court.

The briefs and arguments of counsel which have been filed in this case are principally devoted to a discussion of the proper interpretation of the contract between the Associated Press and the Minnesota Tribune Company (hereafter termed the "Tribune Company"). On the part of the appellant, it is claimed that the ninth clause of the contract in express terms precludes the Associated Press from furnishing its news reports to the Journal Printing Company, its rival in business, because the latter company was not on March 2, 1893, entitled to receive such news reports without the written consent of the Tribune Company. On the other hand, the appellee contends, and this view prevailed in the trial court (77 Fed. 354), that the ninth clause of the contract of March 2, 1893, is controlled by subdivision 2 of article 7 of the by-laws of the Associated Press, relating to the admission of members, which provided, in substance, that newspapers which were entitled to a service of news on October 15, 1892, "under existing contracts with the Western Associated Press or the United Press," should not be considered new members, but might be admitted to membership in the Associated Press without reference to that provision of the by-laws which requires the assent of the respective local boards to the admission of new members in the territory over which such local boards severally exercise jurisdiction. It is claimed by the Associated Press that under the by-law it could lawfully admit the Journal Printing Company to membership without the consent of the Tribune Company, although the latter company was the only newspaper in the city of Minneapolis holding a press franchise in the Associated Press on September 27, 1894, because the Journal Printing Company on October 15, 1892, was entitled to press dispatches, both from the United Press and from the Western Associated Press, under then existing contracts, to which the Tribune Company was itself a party. For the purpose of reaching a correct conclusion concerning the obligations imposed by the contract in question, it is clear, we think, that the contract should not be considered by itself, but should be construed in connection with the by-laws of the Associated Press. Reference is made to the by-laws in the contract, and the seventh paragraph thereof expressly declares "that the rights, duties, and obligations of the parties hereto, except as hereinbefore specifically provided for, shall be controlled and governed by the by-laws of said party of the first part, now or hereafter in force during the life of this contract." The necessary effect of this provision of the contract was to make the subsequent provisions thereof, including the ninth, subordinate to the by-laws. But, taking a broader view of the case, we think it is obvious that the provisions of the by-laws relating to the admission of new members, and the provisions of the contract bearing on that subject, were intended to be harmonious, since it is hardly reasonable to suppose that the Associated Press intended to place restrictions upon its right to admit new members in a particular locality that were contrary to general rules governing the admission of members which had been prescribed for other localities. It must be held, therefore, that the language em-

ployed in paragraph 9 of the contract, on which the appellant company chiefly relies, cannot be construed literally, but is controlled and modified by subdivision 2 of article 7 of the by-laws.

Assuming the foregoing to be a correct view, the next question for consideration is whether the Minneapolis Times can be regarded as a newspaper which on October 15, 1892, was entitled to a service of news under existing contracts with the Western Associated Press or the United Press, within the fair intent and meaning of the by-law. The facts pertinent to this inquiry, which are disclosed by the evidence, are as follows: When the Tribune Company, on June 29, 1891, entered into an agreement with the proprietor of the Minneapolis Times, whereby the latter paper secured the news reports of the Western Associated Press and the United Press for a period of three years, the Tribune Company was the owner of an exclusive news franchise for the city of Minneapolis in each of said news-gathering organizations. The franchise theretofore granted to it by the United Press did not authorize the Tribune Company to sell the news reports which it received to any other newspaper, but provided that it should be entitled to receive the night report of the United Press for publication in the Minneapolis Tribune, "and for no other purpose whatever." Before the contract last referred to was executed, a conference was had between the Western manager of the United Press and a representative of the Tribune Company and a representative of the Minneapolis Times, at which conference the nature of the proposed contract between the two newspapers was made known to the United Press, and its consent to the execution of the proposed agreement was obtained. Such consent was given, however, on condition that the Tribune Company should thereafter pay $90 per week to cover the extra expense of furnishing dispatches for both papers, in lieu of $75 per week, which it had theretofore paid. Immediately after this agreement was made and assented to, the United Press moved its telegraph instruments and operators from the office of the Tribune Company to the office of the Minneapolis Times, where the news dispatches of the United Press were thereafter delivered and received under the aforesaid arrangement until about July, 1893. The evidence does not show conclusively whether the Tribune Company had the right to sell the news reports of the Western Associated Press without the latter's consent, but the fact is disclosed by the evidence that, before undertaking to furnish such reports to the Minneapolis Times, it applied to the Western Associated Press for permission to do so, and obtained its consent. It further appears that on October 15, 1892, and for some months thereafter, negotiations were pending between the promoters of the present Associated Press, which had not then been incorporated, and the United Press, with a view of dividing the United States between the two news-gathering associations, and enabling them to act in harmony with each other. It was at first proposed, and an agreement to that effect was formulated, that the United Press should abandon the Western territory which it then occupied, and confine its operations to the country east of the Allegheny Mountains, while the new Associated Press should collect news in the Middle and Western states, and in most of the

Southern states. This scheme, which contemplated an end of rivalry between the two great news-gathering associations, and the withdrawal of the United Press from much territory which it then occupied, had not been abandoned, but was still under consideration, on December 21, 1892, when the by-laws of the Associated Press were adopted; and it serves to explain, in a great measure, the provision found in subdivision 2 of article 7 of its by-laws, heretofore quoted. It was doubtless supposed that in due course of time the United Press would vacate its Western territory, and that its old patrons in the West would desire to become customers of the Associated Press, and a provision was accordingly inserted in the by-laws by which they might be admitted to membership without the consent of the local boards. In view of these facts, we are strongly inclined to the view that the Associated Press was at liberty to furnish its news reports to the Minneapolis Times without the consent of the Tribune Company. The by-law to which reference has already been made is very broad, and does not, in terms, require that a newspaper should itself have entered into a contract with one of the news-gathering associations therein mentioned, to render it eligible to membership in the Associated Press without the consent of a local board. It might with much reason be claimed that the peculiar language employed in the by-law was intentionally chosen so as to bring within its provisions newspapers that were receiving news reports from the Western Associated Press or the United Press on October 15, 1892, whether such service was being supplied under a contract with one of the associations, or under an arrangement with some third party who was entitled by contract to the news reports of either of said associations. It is not necessary, however, on the present occasion, to adopt such an extreme view, since the evidence, as we think, fairly shows the existence of a tripartite agreement between the United Press, the Tribune Company, and the Minneapolis Times, under and by virtue of which the last-named paper on October 15, 1892, was directly supplied with news by the United Press. It was essential that the United Press should have given its consent to the proposed contract between the Tribune Company and the Minneapolis Times, because the Tribune Company had no right, without such consent, to furnish the news reports of the United Press to any other newspaper. The United Press did give its consent to that agreement, and received a consideration for so doing; and thereby direct contractual relations were established between the Minneapolis Times and the United Press, which were thereafter recognized and observed.

But another reason exists which is in itself sufficient to sustain the decree of the circuit court dismissing the bill of complaint. As has been heretofore stated, this is a suit to specifically enforce a contract of the Associated Press, by restraining it from violating one of the provisions of the contract. It is questionable, to say the least, whether a court of equity could, in any event, grant the relief prayed for, because it is not clear that the damages which the Tribune Company will sustain by reason of the alleged breach are so far irreparable or difficult of ascertainment as to make the remedy at law inadequate. But, waiving that question, it must be borne in mind

that it is a well-established rule that courts of equity will not undertake to enforce an agreement if any of its provisions are so far indefinite or ambiguous as to render it uncertain what were the intentions of the parties, and what obligations they intended to assume. A suit for specific performance can only be maintained where the terms of the agreement are so precise that they cannot be reasonably misunderstood. If the contract which a complainant seeks to enforce is vague or uncertain, a court of equity will not interfere, but will leave him to his legal remedy. Colson v. Thompson, 2 Wheat. 336, 341. And, where a contract is clearly susceptible of different reasonable interpretations, a court of equity ought not to take the chances of decreeing its specific execution in a way which will possibly do violence to the intentions of the parties thereto. In all such cases, as well as where a contract is not fair and just in all its parts, or is tainted with illegality, the party seeking to enforce it should be remitted to his action for damages. Fry, Spec. Perf. §§ 317, 361, and cases there cited. In view of what has already been said relative to the contract involved in the present suit, and the circumstances which attended its execution, and the by-laws under and subject to which it must be construed, we think that it must at least be conceded that the meaning of the contract, in the respect wherein a controversy as to its meaning has arisen, is beclouded with doubt and uncertainty. It cannot be said that the complainant has shown with the requisite certainty that the Associated Press is not entitled, under its contract with the Tribune Company, and under its by-laws, to furnish news reports to the Minneapolis Times, and that its action in that regard amounts to a breach of the agreement, because as good if not better reasons can be advanced in support of the contrary view, that the Associated Press reserved to itself, under its by-laws, the right to do precisely what it has undertaken to do, and is now doing. Our conclusion is, therefore, that by reason of the difficulties encountered in construing the contract, and the doubtful and uncertain character of the right which the bill seeks to enforce, a court of equity is not the proper forum, and that such relief as the Tribune Company may consider itself entitled to can only be obtained at law.

If we had not reached the conclusion heretofore announced, that the bill of complaint was properly dismissed, we should then feel compelled to consider a further question, which is not touched by the briefs or by the oral arguments; and that is whether a court of equity should in any event undertake to specifically enforce an agreement like the one at bar, which would seem to have an obvious tendency to create and perpetuate a monopoly of the news, by limiting the service of news reports to a single newspaper in a large city, and placing it within the power of the proprietor of such newspaper to prevent other newspapers from having access to the same sources of information. The fact that counsel have not seen fit to raise or discuss this question, and the fact that the bill must be dismissed on other grounds, render it unnecessary to consider it, or to express any opinion thereon. The decree of the circuit court is affirmed.