## KANE v. LUCKMAN.

(Circuit Court, N. D. Iowa, Cedar Rapids Division. July 29, 1904.)

### No. 28.

1. SPECIFIC PERFORMANCE—CONTRACT ENFORCEABLE—DEFINITENESS OF TERMS.

Plaintiff in a suit for specific performance testified to the making of an oral contract with defendant for the purchase of 510 cows, in exchange for which he was to convey to defendant a farm situated in Missouri at a stated price, paying the difference in cash, and that he gave defendant a check for $100 to apply thereon. He was to some extent corroborated by another witness. Defendant testified that the agreement was conditional; that he was to go to see the land, and, if found to be as represented by plaintiff, on his return a written contract was to be made, and the check cashed and applied thereon. It was shown, without dispute, that he started the next day to see the land, taking another with him, and that on his return he stated to plaintiff that the land was not at all as represented, and refused to complete the trade, and tore up the check. It was also admitted by plaintiff that there was a mortgage on the land, and that it was not agreed whether he should pay it, or it should be assumed by defendant, which matter was to be determined later. Held, that such evidence did not entitle plaintiff to a decree for specific performance, under the settled rule that it must be clearly shown that the contract was completed, and that its terms were fair, and so definite and certain that they could not be reasonably misunderstood.

2. SAME.

An offer by plaintiff to pay the mortgage did not relieve the contract from the objection of incompleteness, since neither plaintiff nor the court had power to complete it to bind defendant.

3. SAME—MUTUALITY OF CONTRACT.

Such contract, even if admitted, could not be specifically enforced by plaintiff, for want of mutuality in obligation, since, under the statute of frauds, both of Iowa, where it was made, and of Missouri, where the land was situated, it did not bind him to convey the land.

4. SAME—ADEQUATE REMEDY AT LAW—CONTRACT FOR PURCHASE OF CHATTELS.

Under Rev. St. § 723 [U. S. Comp. St. 1901, p. 583], which provides that suits in equity shall not be sustained in either of the courts of the United States in any case where a plain, adequate, and complete remedy may be had at law, such a court is without jurisdiction to decree the specific performance of a contract for the sale to plaintiff of a number of cows at a

131 F.—39

stated price per head, where there is no evidence to show that the cows have any distinctive or peculiar value, which cannot be determined in an action at law for damages, or that defendant is insolvent.

5. FEDERAL COURTS—EQUITY JURISDICTION—OBJECTION ON GROUND OF ADEQUATE REMEDY AT LAW.

In a suit in equity in a federal court, the objection that plaintiff has an adequate remedy at law is jurisdictional, and may be made at any stage of the case.

6. COSTS—ALLOWANCE IN EQUITY—EXAMINING UNNECESSARY NUMBER OF WITNESSES.

Where the successful party in a suit in equity has taken the testimony of a largely unnecessary number of witnesses on an issue, he will be allowed as costs the fees and cost of examination of only such number as the court deems reasonable.

## In Equity.   Suit for specific performance of contract.

Suit in equity to enforce specific performance of an alleged oral contract for the purchase by plaintiff from defendant of 510 cows. It was commenced in the district court of Iowa in and for Johnson county, and removed to this court by the defendant upon the ground of diverse citizenship of the parties. The petition was filed January 20, 1903, and therein it is alleged, in substance: "That on January 8, 1903, the plaintiff bought of the defendant five hundred and ten cows then in the hands of farmers in Johnson and other counties in Iowa, under contracts with defendant therefor, at the agreed price of twenty-five dollars a head, to be paid in a reasonable time. That such agreement was as follows: That plaintiff, having been the owner of three hundred and fifty-seven acres of land in Ralls county, Missouri [describing it], should pay by check the sum of one hundred dollars down upon the cows aforesaid, and execute a good and sufficient deed and furnish an abstract of title to said land to the defendant (said land to be figured at thirty dollars an acre); and, if defendant had exactly five hundred and ten cows, the plaintiff, in addition to the one hundred dollars paid by check, was to pay defendant the remainder of the difference in value between the land at thirty dollars an acre and the cost of the cows, but, if the number of cows was greater or less than five hundred and ten, then the cows were to be valued at twenty-five dollars a head; and said parties mutually and orally agreed to the terms of such sale. That the complainant at the time of such agreement executed and delivered to defendant a check of one hundred dollars as part payment on the purchase price of said cows, and defendant so accepted and received said check, which would have been paid on presentation to the bank upon which it was drawn. That defendant unlawfully and unjustly refuses to stand by or further execute the oral contract herein alleged. That the contracts between defendant and the farmers in whose possession said cows were, are advantageous to the owner of said cows. That by the terms of such contracts the farmers agreed to pay defendant, as rent per annum for said cows, six dollars each for some, and seven dollars each for others, which contracts enhance the value of said cows, and provide employment and use for the same; and the cows so under contract have a peculiar and distinctive value, that they would not have but for such contracts, and complainant cannot be fully compensated by a money judgment in lieu of the specific performance of said oral contract. That the plaintiff has a clear legal title to said land before described, free from incumbrance, except a mortgage of about six thousand dollars. That, in regard to said mortgage, the defendant agreed to inform plaintiff whether defendant would take the land subject to said mortgage, and assume payment of the same, or require plaintiff to pay the same. That plaintiff brings into court for defendant's use, and tenders herewith, an abstract of title of said land, and a warranty deed thereof, and asks defendant to inform plaintiff whether he desires to assume the said mortgage,

¶ 5. See Equity, vol. 19, Cent. Dig. §§ 173–176.

¶ 6. Right to costs in equity, see note to Tug River Coal & Salt Co. v. Birgel, 17 C. C. A. 368.

as a part of the consideration of said premises, or whether he desires to have plaintiff pay the same and free the land of said incumbrance. That defendant has no tangible property in Iowa, except said cows, and plaintiff fears defendant will, unless restrained, sell or dispose of his interest in said cows, or a part thereof. That, if said cows were sold by defendant, plaintiff would lose the beneficial contracts under which farmers and others hold the same, and would suffer irreparable loss and injury. Wherefore the petitioner asks that a temporary writ of injunction issue, restraining defendant from selling or disposing of said cows, or making any contracts in relation thereto; * * * that, upon the final hearing, petitioner have a decree of specific performance against defendant, conveying and quieting the title in plaintiff of all of said cows; that the court determine whether plaintiff is to cancel and pay off said mortgage, or whether defendant will assume the same as a part of the consideration of said land; and for such other and further relief as may be equitable."

February 12, 1903, a supplemental petition was filed in the state court, in which it is alleged, in substance, "that the cows bought by plaintiff from defendant are in the hands of farmers, in lots of from one to five or ten, and held under many contracts, some of which expire March 1, 1903, and others do not so expire, but the cows are to be held thereunder; that, by the agreement between plaintiff and defendant, plaintiff was to take said cows as of the date of March 1, 1903, and renew or otherwise change the contracts under which said cows are held at this time, or assume the liability of defendant therein, and, in any event, plaintiff was to be the owner of said cows in the contracts aforesaid, and to be entitled to all the benefit, profit, or issue arising thereunder, as well as to assume the liability of said defendant; * * * that the lease of the land described in the original petition, which plaintiff traded to defendant, expires March 1, 1903; that plaintiff is ready to deliver his warranty deed according to his contract, and to give defendant possession thereof."

A temporary injunction was issued by the state court as prayed. The answer of defendant is, in substance: "That he denies the allegations of the petition and supplement, except as admitted. Admits that he owns the five hundred and ten cows as alleged. That plaintiff and defendant verbally agreed upon a trade whereby defendant was to sell to plaintiff said cows at twenty-five dollars a head, and take in part payment therefor three hundred and fifty-seven acres of land in Ralls county, Missouri, at thirty dollars an acre, which was to include the crop of 1902 raised upon said land, and the balance in cash, providing said land was as represented by plaintiff. That defendant had never seen said land, and, to induce defendant to enter into said verbal agreement, plaintiff verbally represented and said to defendant that said land was a good prairie farm, all tillable land, suitable for farm purposes, except about forty or fifty acres of timber land, which was not more than needed for said farm, which timber land could be easily cleared off, and the land converted into good, tillable land; that the buildings on said land were all located on or near a public highway. That said agreement was to be reduced to writing, and plaintiff was to make defendant a warranty deed, and furnish an abstract showing the land to be free and clear of all liens and incumbrances. That plaintiff did deliver to defendant a check for one hundred dollars, which was accepted by defendant with the express understanding that, if said land was as represented by plaintiff, then the oral contract was to be reduced to writing, signed by both parties, and the check was then to be considered as part payment on said cows. That in pursuance of said verbal agreement this defendant went from Iowa City, Iowa, to Ralls county, Missouri, on January 9, 1903, saw said land, and found that the same was not as represented by plaintiff, and not worth more than four or five dollars an acre [and describing the particulars in which it was not as represented]. That he immediately returned to Iowa City, and so informed plaintiff, and told him that he (defendant) would not take the land, because it was not as plaintiff had represented it; that he would not complete the agreement. And defendant thereupon destroyed the check for one hundred dollars, which he had never presented for payment, and which, in fact, never was paid. That the representations of plaintiff as to the quality of said land were false and fraudulent, known by him to be so, and were made by plaintiff with intent to deceive and defraud defendant and induce said trade, and that defendant relied on said representations in making said deal. That the alleged contract

was never reduced to writing, nor signed by either of the parties, nor was any part of the price of said land ever paid by defendant, nor of said cows by plaintiff; and none of said land was ever delivered to, or possession thereof taken by, defendant, and none of said cows delivered to, or possession thereof taken by, plaintiff, and that said contract is wholly within the statute of frauds."

Remley & Ney and Ranck & Bradley, for complainant.
A. E. Maine and Dawley, Hubbard & Wheeler, for defendant.

REED, District Judge (after stating the facts). The controlling questions arising in this suit for determination are: (1) Has the complainant shown a completed contract between himself and the defendant, not within the statute of frauds? And (2) If he has, is it one that equity will decree to be specifically performed? A large amount of testimony has been taken, much of it conflicting, and that of plaintiff and defendant individually as to the consummation of a completed contract between them irreconcilably so. Such of it as it is deemed necessary to refer to will be stated in the course of the opinion.

1. Specific performance will not be decreed unless it is clearly shown that the contract is completed, and that its terms are fair, and so definite and certain that they cannot be reasonably misunderstood. Colson v. Thompson, 2 Wheat. 336, 4 L. Ed. 253; Purcell v. Miner, 4 Wall. 514, 18 L. Ed. 435; Carr v. Duval, 14 Pet. 79, 10 L. Ed. 361; Nickerson v. Nickerson, 127 U. S. 668, 8 Sup. Ct. 1355, 32 L. Ed. 314; Hennessey v. Woolworth, 128 U. S. 438, 9 Sup. Ct. 109, 32 L. Ed. 500; Dalzell v. Dueber Watch Co., 149 U. S. 315, 13 Sup. Ct. 886, 37 L. Ed. 749; Wesley v. Eells, 177 U. S. 370, 20 Sup. Ct. 661, 44 L. Ed. 810; Minnesota Tribune Co. v. Associated Press, 83 Fed. 350, 27 C. C. A. 542.

In Purcell v. Miner, 4 Wall. 513, 18 L. Ed. 435, it is said:

"Mere breach of the parol promise will not make a case for the interference of a chancellor. It is plain that a party who claims such interference has the burden of proof thrown on him. He knows that the law requires written evidence of such contracts, in order to their validity. He has acted with great negligence and folly who has paid his money without getting his deed. When he requests a court to interfere for him and save him from the consequences of his own disregard of the law, he should be held rigidly to full, satisfactory, and indubitable proof: First. Of the contract and its terms. Such proof must be clear, definite, and conclusive, and must show a contract leaving no jus deliberandi or locus pœnitentiæ. It cannot be made out by mere hearsay, or evidence of the declarations of a party to mere strangers to the transaction, in chance conversation, in which the witness had no reason to recollect, from interest in the subject-matter, which may have been imperfectly heard, or inaccurately remembered, perverted, or altogether fabricated—testimony, therefore, impossible to be contradicted. Second. That the consideration has been paid or tendered. But the mere payment of the price, in part or in whole, will not of itself be sufficient for the interference of a court of equity; the party having a sufficient remedy at law to recover back the money. Third. Such a part performance of the contract that its rescission would be a fraud on the other party, and could not be fully compensated by recovery of damages in a court of law."

In Minnesota Tribune Co. v. Associated Press, 83 Fed. 350, 27 C. C. A. 542, Thayer, Circuit Judge, speaking for the Circuit Court of Appeals for this circuit, says:

"A suit for specific performance can only be maintained where the terms of the agreement are so precise that they cannot be reasonably misunderstood. If the contract which the complainant seeks to enforce is vague or uncertain, a

court of equity will not interfere, but will leave him to his legal remedies; and, where the contract is clearly susceptible of different interpretations, a court of equity ought not to take the chances of decreeing its specific execution in a way which will possibly do violence to the intention of the parties thereto. In all such cases, as well as where a contract is not fair and just in all its parts, * * * the party seeking to enforce it should be remitted to his action for damages."

The other cases cited are to the same effect, and they establish the rule by which this controversy must be determined. Has the plaintiff, by his testimony, brought himself within this rule? Much of the testimony goes to the question as to who first proposed, and was the more anxious, to make the trade which is the subject of the controversy between the parties. This is not of great importance. The vital question is, did the parties get beyond negotiations, and finally agree upon definite terms for an exchange of their properties, and that such agreement was not within the statute of frauds? It is completed contracts that conclude parties, and not mere negotiations. From the testimony it appears that the parties were negotiating for several days. The plaintiff at first wanted $30 an acre for his land, not including the crop of 1902 raised thereon; and the defendant wanted to turn in only a part of his cows, at $30 a head. Defendant had never seen the land, and plaintiff several times during the negotiations suggested to him that he go and look at it. Defendant says that, in reply to these suggestions, he told plaintiff there was no use in going to look at the land until it was certain they could agree upon terms of an exchange, and then he would go and look at it. A Mr. Hill was instrumental in trying to bring about the deal, and was employed by defendant, after negotiations had been pending for some days, to do so. Plaintiff says that on January 8th defendant was around his store nearly all day, urging a trade, and that upon that day they finally agreed upon a contract. In regard to this he says, after telling of the negotiations:

"Q. Did you finally reach a conclusion on January 8th as to the sale of the land? A. Yes, sir; it was just about six o'clock, and I said I would see him in the morning. He says: 'No, sir, you won't; you will see me right now. We will close this right now. I worked too hard to get this deal to have any fooling about it.' * * * Charley Chansky, my workman, was in the store. That was all. I said, 'What do you want to do?' He said, 'Mr. Maine is my lawyer, and we will go there.' We started, but Mr. Maine's office was closed— there was no light there—and we came back into the store; and, before going in, Mr. Hill made a proposition to give him a hundred dollars, and I gave him a check for a hundred dollars. He says, 'Come back after supper,' and I says, 'No; I won't come back.' Q. What was said about how you would trade? A. Well, I was to take the cows at twenty-five dollars a head, and he was to take the land at thirty dollars an acre. Anything under the number of cows— I was to have twenty-five dollars in cash for any number of cows he couldn't furnish up to five hundred or five hundred and ten. I told him there was a mortgage on the place; I would clear it if he wanted me to. I believe he rather talked as though he would like to have it clear. I believe that is about the way he wanted it. But I told him it was immaterial to me; that I would clear it or leave it as it was; that it was only bearing 5%. This conversation occurred several times before I gave him the check. We were going to Maine's office to close the deal in the way you would close up a deal, I suppose—to put it in writing. We were to go there and put it in writing. When we didn't find him, we closed it by his accepting one hundred dollars. Q. How did the check read? A. 'Payment on 500 cows on land deal.' It was dated January 8, 1903, payable to order of Frank Luckman, one hundred dollars, on Iowa City State Bank. I

had plenty of money in the bank at that time to pay the check. 'Couldn't say where that check is now. I saw it since. * * * He never offered me the check back, not at that time. Hill said, 'Write a check for a hundred dollars.' He was not satisfied, on account of Mr. Maine not being at his office, and, to satisfy him, Hill asked him, would he be satisfied with a check, and he said he would. Hill first made the proposition that I pay him some money, but I had none in the safe. Then Hill asked if he would be satisfied with the check, and he said he would. When I delivered him the check, I went home, and left Hill and Luckman in the store. * * * I saw them next day. Luckman said: 'If you don't take two hundred head of cows, I won't call it a trade, and I will go down and look at the land; and, if it don't suit me, I won't take it.' I told him: 'No; I traded for five hundred. I won't take two hundred.' I saw him after that several times. * * * In the trade there that evening there was nothing said about the lease of the land. I showed him the lease January 8th. I was to assign him the lease. That was the proposition finally accepted—that he was to have the deal just as I got it. * * * The mortgage is still on that land. I can pay it off, or give it with the mortgage. Either way suits me. I don't care. * * *

Cross-examination: "Up to the night that this trade was made, we had reached no definite agreement. Up to that time he refused to trade me all of his cows, and I had refused to trade my land with the crop. * * * Next day after the trade, Luckman told me he was going to Missouri. He told me who was going with him. I can't recollect what I said, but possibly I did say, 'Why can't Jim [my brother] go down with you?' If I did, I had reasons for it. After he came back from Missouri, I think he did tell me the farm was not anything like I represented. I know that he complained about the farm. I learned that he tore up the check that I gave him."

Redirect examination: "I didn't understand that the cows were to be moved out of the hands of the farmers who had them under contract. * * * I understood there was simply to be a deed made to Luckman after the time I gave the check, and he was to turn over the contracts to me, and the difference in value, if any, was to be settled. The time for doing any part of that at the time of making the contract and delivery of this check was not fixed. Prior to the time of making the contract, we talked about the rent that they were paying for the cows, and how long the contracts run—some of them run for four years; the shortest for a year. We had one of his contracts, which we examined many times. I knew what they were."

This is substantially all of the testimony of the plaintiff as to what occurred at the time the check was delivered and the contract completed as he claims. It is over the objection of defendant as being within the statute of frauds. Mr. Hill substantiates him in many particulars, but not in all.

The defendant, after relating their negotiations for several days, says

"I saw Kane January 8th at his store. Mr. Hill was with me there in the afternoon, and after six o'clock there was nobody but Kane when Hill and I came in."

After relating some of the negotiations, the witness continues:

"Well, I says, 'I will put in 510 [cows], and I will go down to-morrow and look at the farm, and, if the farm is what you claim it is, when I come back we will make a trade.' There was a check given. Mr. Hill said, 'Better give Frank a check for $100.' I said, 'No; there is no need of it. Wait until I come back from Missouri.' Hill said, 'Better give him a check.' 'Yes,' says Kane; 'better give him a check for $100.' They insisted on my taking it, and I took it and put it in my pocket. The contract was to be drawn when I came back from Missouri, if I was satisfied about the farm. If the bargain went through, the cattle were to be delivered the 1st of March, and I was to get possession of the land the 1st of March. This was about half past six o'clock in the evening. Mr. Kane went north, and Hill and I went south. It was all done in fifteen

minutes' time. I saw Kane at his store next morning about eight o'clock, and said, 'Which is the best way to go down to this farm?' And he says, 'There is two ways of going. Let's go up to Dayton's office, and he will know better than I do.' We went to Dayton's office, and Kane asked Dayton which was the best way to go down, and Dayton said, 'You can't go until this evening, but the best way is to go to Quincy, Ill., change cars, and go to Monroe City.' And they gave me directions to go from Monroe City to reach the farm. They called it the 'Lundburg Farm.' Up to this time I didn't know where the farm was located. At the time of the conversation that morning, as we came down from Dayton's office, Mr. Kane says, 'Is there anybody going down with you?' I says I was going to try to get Will Havard; and Kane says, 'Why can't Jim go?' I says, 'Yes; Jim can go if he wants to;' and he says, 'Will you pay his way?' and I says, 'No.' Jim didn't go with us. I went down that evening to the farm, and we went out to see it Saturday morning. Havard was with me. We went over the farm. [Witness described the farm in detail, and says that it was nothing like what Kane represented it to be.] I got back to Iowa City Sunday morning, January 11th, and saw Kane Monday morning at his store, and I said to him: 'Mr. Kane, you are a good one. You are a dandy, for to have me go down to Missouri to look at this farm. Why in the world didn't you tell me what this farm was? It is no prairie farm. It is no such thing. It is pretty nearly all timber, brush, and cañons. There is places on there that a goat couldn't climb.' 'Well,' he says, 'If you don't want to trade, what is the use of running the farm down?' I says, 'I ain't running it down.' 'Well,' he says, 'Havard is running it down all around town.' Afterwards I tore up the check, and Hill said I ought not to have done so, and I said it was no good.''

Several witnesses testified in behalf of complainant that defendant told them he had made a trade with Kane. Defendant admits conversations with some or all of these witnesses, but denies that he told them he had made a trade, but did say that he was talking with Kane of trading for the land. At least one witness testifies that Kane told him that he (Kane) was trying to trade this land in Missouri to Luckman, that Luckman had gone to Missouri to look at it, and that, if they didn't complete the trade, complainant would then talk with the witness about trading with him.

Without further stating the testimony, it must suffice to say that defendant positively denies that a trade was completed, and says that the agreement, so far as reached, was conditional upon the land being as represented by complainant; that he was to go to Missouri and look at it, and that the check was received by him with the express understanding that, if the land was as represented, the contract was to be put in writing, signed by the parties, and the check was then to be considered as part payment, and the deal finally settled by March 1st; that he did go to Missouri, starting on January 9th, and saw the land; that it was not as represented by complainant; that he at once returned to Iowa City, and so informed complainant, and that he would go no further with the deal, and tore up the check, which had never been presented for payment, and never was, in fact, paid. That defendant did go to Missouri, saw the land, returned at once, and told complainant it was not as represented, and that he would go no further with the deal, is established beyond controversy. Complainant alleges in his petition that he was to take the cows as of March 1st, but, in his testimony, says that nothing was said about this. In regard to the mortgage, it clearly appears that no agreement was reached as to whether complainant was to pay the same, or defendant was to as-

sume it, and the prayer of the petition is that the court shall determine which shall be done. The testimony is silent as to the amount of this mortgage, its date, and when it matures. All that complainant says about it is that it bears 5 per cent. This might be a favorable rate of interest, but whether the loan would be a desirable one for defendant to carry would depend upon other terms of the mortgage. In the petition the complainant alleges that defendant was to determine whether or not he would assume the mortgage. The parties had a right to agree to this, and, if it was a part of their negotiations, and they did not agree thereon, then the terms of the exchange were not finally completed. It also appears from the testimony that these parties met the morning after the alleged agreement, and had a conversation about the deal, and about defendant's going to Missouri to look at the land. They do not agree as to what the conversation was, but the fact that it was had, that the check was not presented for payment, and that defendant started on the first train that he could go on to see the land, tend at least to corroborate defendant that the trade was not finally consummated. True, the passing of the check tends to show an agreement of some kind, but that is not conclusive, and if it was received with the understanding that the agreement, whatever it was, was conditioned upon the land being as represented by the complainant, the parties had not passed the stage of negotiations, and either might still withdraw therefrom.

In argument, counsel for complainant anticipated that the question of the completion of the contract, because of the failure of the parties to agree in respect to the mortgage and the time of the final settlement, would be raised, and said that it might be conceded that the deal was to be settled March 1st, as claimed by defendant, and that, as to the mortgage, the complainant would pay it, and relieve defendant therefrom, and that would eliminate these questions. But that would be permitting the complainant to make the contract, which the parties have failed to agree upon. These matters go deeper than counsel seem to suppose, and to the vital question of the case, which is, did the parties finally agree upon the terms of the contract? If they did not, negotiations were still pending, and the court cannot complete the contract for them.

In Dalzell v. Dueber Watch Co., 149 U. S. 315, 13 Sup. Ct. 886, 37 L. Ed. 749, above, Mr. Justice Harlan says:

"From the time of Lord Hardwicke, it has been the established rule that a court of chancery will not decree specific performance unless the agreement is certain, fair, and just in all its parts [citing the authorities], and the rule has been repeatedly affirmed and acted upon by this court. * * * So this court has said that chancery will not decree specific performance if it be doubtful whether an agreement has been concluded or is a mere negotiation, nor unless the proof is clear and satisfactory, both as to the existence of the agreement and as to its terms."

In Pom. Spec. Per. § 145, it is said:

"In order that any agreement, whether covered by the statute or not, whether written or verbal, may be specifically enforced, it must be complete in all its parts; that is, all the terms which the parties have adopted as portions of their contract must be finally and definitely settled; and none must

be left to be determined by future negotiation; and this is true without any regard to the comparative importance or unimportance of these several terms."

It is alleged in the petition that complainant was to assume the liability of defendant in the leases of the cows to the farmers. What this liability is, nowhere appears in the evidence; but, if it did, how could the court in its decree compel the farmers to accept complainant in lieu of defendant for such liability, whatever it is, and absolve defendant therefrom? It is, to say the least, doubtful, under this testimony, whether an agreement was finally concluded, and its terms definitely settled by these parties.

Again, the general rule is that the contract must be mutual in obligation, at least before it will be specifically enforced against either of the parties. If, therefore, from the nature or form of the contract itself, or for any other reason, the agreement devolves no obligation upon one of the parties, or if it cannot for any reason be specifically enforced against him, then he is not entitled to the remedy of specific performance against the other, even though in a bill therefor he expresses a willingness or offers therein to perform on his part. Luse v. Deitz, 46 Iowa, 205; Bodine v. Glading, 21 Pa. 50, 59 Am. Dec. 749; Hawley v. Sheldon, Har. Ch. (Mich.) 420; Fry on Spec. Perf. § 286; Pom. Spec. Perf. § 163 et seq. The Iowa and Missouri statutes both require an agreement for the sale of land to be in writing, and signed by the party to be charged.

The Iowa statute is as follows:

Section 4625, Code 1897: "Except where otherwise especially provided, no evidence of the following enumerated contracts is competent unless it be in writing, signed by the party charged or his authorized agent: (1) Those relating to the sale of personal property where no part of the property is delivered and no part of the price paid; * * * (4) those for the creation or transfer of any interest in lands."

Section 4626: "The provisions of the * * * 4th subdivision of the preceding section do not apply where the purchase money or any portion thereof has been received by the vendor, or when the vendee with the actual or implied consent of the vendor has taken and held possession under the contract. * * *"

This statute, in effect, is the same as the English statute, and the decisions construing that statute are applicable to this. Westheimer v. Peacock, 2 Iowa, 528. The words "purchase money" mean consideration to be paid for the land. Devin v. Himer, 29 Iowa, 297.

The statute of Missouri is:

"No action shall be brought * * * upon any contract made for the sale of lands or any interest in or concerning them * * * unless the agreement upon which the action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or some other person by him thereto lawfully authorized in writing." Rev. St. Mo. 1899, § 3418.

This alleged contract, so far as it relates to the cows and leases thereof, might be controlled by the Iowa statute; but, as the land is in Missouri, any sale or contract for the sale thereof, to be valid, must conform to the law of that state. United States v. Crosby, 7 Cranch, 115, 3 L. Ed. 287; Kerr v. Moon, 9 Wheat. 566, 6 L. Ed. 161; Mc-

Cormick v. Sullivant, 10 Wheat. 192, 6 L. Ed. 300; United States v. Fox, 94 U. S. 315, 24 L. Ed. 192; Story's Conflict (7th Ed.) §§ 435, 436.

In United States v. Fox, above, it is said:

"It is an established principle of the law, everywhere recognized, arising from the necessity of the case, that the disposition of immovable property, whether by deed, descent, or any other mode, is exclusively subject to the government within whose jurisdiction the property is situated."

Under either of these statutes, could the contract in this case, as claimed by the complainant, be enforced against him? If not, is there such a mutuality of obligation that it could be enforced against defendant either at law or in equity? It was not signed by the complainant or his authorized agent; no part of the consideration to be paid for the land was received by him, or possession of the land taken by the defendant. The words, "Payment on 500 cows on land deal," if written upon the check which it is claimed was accepted by defendant as part payment of the cows, cannot be construed as an agreement or memorandum by the complainant to convey the land; and, even if it could be, such agreement would be void for incompleteness and uncertainty. Williams v. Morris, 95 U. S. 444–455, 456, 24 L. Ed. 360. The check was intended as part payment by complainant on the cows, and not as part payment to be received by him on the land. There is nothing, therefore, to take the case out of the statute of frauds of either state, so far as the complainant is concerned; and, if suit was brought against him by defendant in either state to enforce conveyance of the land, it seems clear that the complainant could successfully defend upon this ground alone. The alleged contract is entire, and, unless it could be enforced in its entirety against complainant, it should not be enforced against the defendant.

2. Is the contract, as claimed by complainant, one that a court of equity, in any event, will decree to be specifically performed?

The Revised Statutes of the United States provide:

"Sec. 723. Suits in equity shall not be sustained in any of the courts of the United States, in any case where a plain, adequate and complete remedy may be had at law." [U. S. Comp. St. 1901, p. 583.]

In New York Guaranty Co. v. Memphis Water Co., 107 U. S. 214, 2 Sup. Ct. 286, 27 L. Ed. 484, it is said:

"This enactment" (section 723, Rev. St. [U. S. Comp. St. 1901, p. 583]) "certainly means something, and, if only declaratory of what was always the law, it must at least have been enacted to emphasize the rule and impress it upon the attention of the courts."

In Root v. Ry. Co., 105 U. S. 189, 26 L. Ed. 975, the grounds upon which courts of equity will entertain suits and afford relief are clearly stated. At page 212, 105 U. S., 26 L. Ed. 975, it is said:

"The result of the argument is that whenever a court of law is competent to take cognizance of a right, and has power to proceed to a judgment which affords a plain, adequate, and complete remedy, without the aid of a court of equity, the plaintiff must proceed at law, because the defendant has a constitutional right to a trial by jury."

To the same effect is Hipp v. Babin, 19 How. 271, 15 L. Ed. 633, and Parker v. Mfg. Co., 2 Black, 545, 17 L. Ed. 333.

That a contract for the purchase of chattels will not ordinarily be decreed to be specifically performed by a court of equity because the law affords an adequate remedy in damages for the breach of such a contract, is not seriously questioned. That such is the rule is plain. Clark v. White, 12 Pet. 178, 9 L. Ed. 1046; Richmond v. Ry. Co., 33 Iowa, at page 480; First Nat. Bank v. Day, 52 Iowa, 680, 3 N. W. 728; Hull v. Hull, 117 Iowa, 63, 90 N. W. 496; Pierce v. Plumb, 74 Ill. 326; Moulton v. Warren Mfg. Co., 81 Minn. 259, 83 N. W. 1082; 3 Parsons' Contracts, 364, 365; 3 Pomeroy's Equity (2d Ed.) § 1402; Pomeroy's Specific Performance of Contracts, § 11 et seq.; 2 Story's Equity, § 717.

In section 1402, 3 Pomeroy's Equity, it is said:

"Whenever a contract conveying real property is unobjectionable * * * it is as much a matter of course for a court of equity to decree specific performance as it is for a court of law to give damages for its breach. As to chattels, the doctrine is equally well settled that equity will not, in general, decree the specific performance of contracts concerning them, because their money value, recovered as damages, will enable the party to purchase others of like kind and quality. * * * But where particular chattels have some special value to the owner over and above any pecuniary estimate, * * * or where they are unique, rare, and incapable of being reproduced by money damages, equity will decree specific delivery of them to their owner, and the specific performance of contracts concerning them."

The rule and the exceptions thereto are more fully stated in Pomeroy on Specific Performance of Contracts, §§ 11, 12.

In Story's Equity, § 717, it is said:

"So courts of equity will not generally decree performance of a contract for the sale of stock or goods, not because of their personal nature, but because the damages at law, calculated on the market price of the stock or goods, are as complete a remedy to the purchaser as the delivery of the stock or goods contracted for, inasmuch as with the damages he may ordinarily purchase the same quantity of like stock or goods."

It is urged in behalf of the complainant that the case, upon its facts, is within the exception to the general rule stated in the authorities above cited, because of the allegation in the petition as amended "that the value of the cows is enhanced by reason of the contracts under which they are held by the farmers; that the cows so under contracts have a peculiar and distinctive value, that they would not have but for such contracts; and that plaintiff cannot be fully compensated by a money judgment in lieu of the specific performance of such contract." The last clause is, of course, a mere conclusion. There is an entire absence of proof, however, to sustain this allegation, conceding it to be sufficient to make a case for equitable cognizance. The testimony of the plaintiff is silent upon the value of the cows, whether under lease or not. It is true, complainant himself says that defendant told him he was getting $6 a head a year for some, and $7 for others, and that the leases were to run from one to four years, and that the cows were to be valued at $25 a head in the trade; but, aside from this, there is no evidence whatever showing that the value of the cows was enhanced because of the contracts under which they were held, or that they were of any distinct or peculiar value because of such contracts, that could not be fully measured in dollars. It surely cannot be said, as a matter of law, in the absence of all evidence, that, because the

owner of a cow leases or lets her to a farmer for one, two, or three years for an annual rental or compensation of $6 or $7, the animal, regardless of peculiar conditions or characteristics, is thereby endowed with any unique or peculiar traits or qualities that would render her value, or the contract under which she is held, incapable or even difficult of being estimated in money; nor would the fact that 510 of such animals were so leased or let render the value of that number incapable of being proven or determined in a court of law. This allegation, in the absence of any evidence to sustain it, is the only ground upon which complainant relies to bring this case within the cognizance of a court of equity. By his own testimony, however, he agreed with the defendant upon the value of such animals under contract at $25 a head. Equity will not decree specific performance of chattels, though unique or peculiar in character, even, when their pecuniary value has been fixed by agreement of the parties, or can be readily ascertained, so that an adequate compensation in damages can be recovered at law. Pomeroy's Specific Performance of Contracts, § 12; Bodine v. Glading, 21 Pa. 50, 59 Am. Dec. 749. If the value fixed by complainant and defendant was less than the actual value of these contracts and cows, so that complainant obtained by his alleged agreement a valuable contract, nothing whatever is shown why the value in excess of the contract price cannot be fully proven, and the amount of such excess recovered at law. There is no averment or proof that defendant is insolvent. It is true, the petition avers the defendant has no tangible property in Iowa, other than this lot of cows, but that is far short of an allegation of insolvency. And if it were inconvenient, even, to fully prove the value of the animals and contracts, which, however, is not shown, that is not sufficient to show that the remedy at law is incomplete or inadequate. The presumption is that the value of the cows as agreed upon by the parties is their fair value, and it cannot be inferred, in the absence of testimony, that their actual value was in excess of the agreed value, or that the whole lot would not be sufficient to satisfy the excess of value which the testimony might show, if any. If this were shown, then the contract whereby their value was fixed at such price that a breach of it would require the whole or any considerable portion of the entire lot to satisfy this excess of value would be such an unconscionable one that a court of equity would not under any circumstances enforce it.

Counsel for complainant cite and rely upon authorities which, in effect, hold that when one contracts for the purchase of stocks of corporations, or chattels or commodities for a specific purpose or of peculiar value, which are scarce or cannot be obtained generally in the market, or have no established market value which can be shown as a basis for damages, equity will decree the specific performance of such contracts. This rule may be conceded, but the facts in the present case do not come within it. McNamara v. Home Land & Cattle Co. (C. C.) 105 Fed. 202, is so cited. This was a bill filed to enforce specific performance of an agreement for the purchase of a lot of cattle, and it was alleged, among other things, that the purchase was made by plaintiffs to enable them to fulfill contracts which they had with the government. Specific performance was decreed by the Circuit

Court, but the decree was reversed by the Court of Appeals for the Ninth Circuit. Home Land & Cattle Company v. McNamara, 111 Fed. 822, 49 C. C. A. 642. That court, in its opinion, says:

"The bill alleges, it is true, that the cattle under contract possessed a special and peculiar value to the appellees, which could not be adequately compensated for in money damages. This averment is evidently inserted for the purpose of showing that the case is one for specific performance, * * * but there is no evidence whatever of any such damages."

The decree was reversed and the case remanded, with instructions to dismiss the bill.

The complainant has in fact paid nothing upon this alleged contract, and, if it is not enforced against defendant, he suffers nothing but the loss of his bargain, and this alone is not sufficient to warrant a decree for its specific performance.

It may be that the tendency of modern decisions is to enlarge, rather than restrict, the right to the specific performance of contracts fairly entered into, both as to real and personal property. The right, however, is not absolute, but rests in the discretion of the court, to be exercised upon a consideration of all the circumstances of each particular case. Willard v. Tayloe, 8 Wall. 557–565, 19 L. Ed. 501. And when it appears in the particular case that the remedy at law is complete, and in its ordinary course will afford a full compensation by way of damages, the party will be remitted to his legal remedy. Especially is this true of the federal courts, under section 723, Rev. St. [U. S. Comp. St. 1901, p. 583], above.

It is urged that this objection should have been raised by demurrer, or in some way before answer, and that it is too late to do so upon the final hearing. In the courts of the United States this objection is regarded as jurisdictional, and to be enforced by the court upon its own motion, though not raised by the pleadings or suggested by counsel. Hipp v. Babin, 19 How. 271, 15 L. Ed. 633; Parker v. Mfg. Co., 2 Black, 545, 17 L. Ed. 333; Lewis v. Cocks, 23 Wall. 466, 23 L. Ed. 70; Allen v. Pullman's Palace Car Co., 139 U. S. 658, 11 Sup. Ct. 682, 35 L. Ed. 303. See, also, Keokuk Ry. Co. v. Donnell, 77 Iowa, 221, 42 N. W. 176.

It is unnecessary to consider the questions as to the character and value of the land, for, upon any view that can be taken of the case, the conclusion is that the complainant is not entitled to a decree; that the injunction should be dissolved, and the bill dismissed; and it is so ordered.

4. The case is one that calls for an equitable disposition of the costs. The testimony consists of more than 4,000 typewritten pages of legal cap. The complainant's abstract of it consists of 680 such pages, and the defendant's of 360 such pages. Much testimony was taken by both parties of witnesses residing in Missouri in regard to the character, quality, and value of the land. Defendant had the land surveyed, and a plat made, minutely describing it; and the surveyor who made these testified at length as to the character, quality, location, and value of the land. In addition to the surveyor, defendant produced and examined 20 witnesses, all or nearly all of whom decribed the land in detail as the surveyor had done; thus largely increasing the volume

of the testimony, and expense of taking the same. Five competent witnesses, including the surveyor, would have given full and complete information as to the character of this land and its value. The complainant examined eight witnesses to impeach the defendant, and the defendant examined twenty-two witnesses upon this point. Upon the reading of the testimony, the court limited each side to six witnesses upon this question. The defendant will be allowed, as costs, the fees of five of the witnesses examined in Missouri, including the surveyor, and the expense of taking their testimony; the fees of six witnesses in the matter of impeachment, and the expenses of taking their testimony; and the fees of the five witnesses taken at Iowa City as to the negotiations and alleged contract between the parties, and the expense of taking their testimony. These fees and the other costs of the case upon the merits will be taxed against complainant. The fees of all other of defendant's witnesses upon the merits, and the expense of taking their testimony, will not be so taxed.

Ordered accordingly.