# JULIAN LINARES ET AL.

## *v.*

# JUAN BIANCHI ROSAFA ET AL.

San Juan, Equity, No. 989.

SPECIFIC PERFORMANCE.

Foreign Consul—Certificate of Citizenship.

1. A certificate of the Spanish Consul General in Cuba as to Spanish citizenship when certified by the American consul is accepted as evidence.

Equity—Specific Performance.

2. Specific performance is one of the most characteristic heads of equity jurisprudence, being derived from the Roman pretorian jurisdiction, and fully developed since the time of the Lord Hardwicke and Lord Eldon.

Specific Performance—Jurisdiction of Federal Court of Porto Rico.

3. The fact that the Spanish courts in Porto Rico had jurisdiction to interdict which has not been carried over into the Porto Rican Code of Civil Procedure does not affect the innate equity jurisdiction of the Federal court on the subject of specific performance.

Specific Performance—Federal Jurisdiction.

4. Speific performance does not usually apply to personal property and stock, but if these are of peculiar value or if they are closely connected with interest in land the claim is within the jurisdiction of a court of equity.

Specific Performance—Federal Jurisdiction—Elements.

5. The agreement to be performed must be certain, fair, and just in all its parts. According to Lord Hardwicke it is the most useful head of chancery jurisdiction.

Specific Performance— Procedure.

6. The proof must be clear, whether in direct or circumstantial evidence.

PORTO RICO

Linares v. Rosafa.

Practice—Depositions.
    7. Where the pages of depositions have become detached during
the trial but the court is satisfied of their continuity, no objection
will lie.

Practice—Conflicting Testimony.
    8. Where the witnesses who know more about the transaction do
not sustain the necessary elements of the plaintiff's contention, the
case cannot be said to be clearly proved.

Opinion filed December 30, 1918.

---

### Statement of Facts.

The bill in this cause was filed March 9, 1917, and the
answer on June 25. After different preliminary proceedings,
change of attorneys, depositions, and amendments, the case
came on for hearing and was submitted December 24 on briefs
only lately filed.

Plaintiff Luzunaris is alleged to be a citizen of New York
and plaintiff Linares a citizen of Spain. Defendants are a
firm of Americans doing business in Mayaguez, Porto Rico,
under the name of Sucesores de Bianchi. The sugar planta-
tion and mill called Central Coloso near Aguadilla in Porto
Rico was for sale, and in June, 1916, defendants' general
partner, Juan Bianchi, went to New York for the purpose of
raising the necessary funds with which to purchase it. Plain-
tiff Luzunaris became connected with the transaction, either as
interpreter or as agent, and acted with Bianchi in the New
York arrangements. It seemed that the term of the option
obtained would soon expire and there followed certain arrange-
ments which are the subject of this suit. The contention of
the plaintiffs is that defendant Juan Bianchi was unacquainted

Linares v. Rosafa.

with business men and methods in New York, and through plaintiff Luzunaris secured the assistance of plaintiff Linares for that purpose. After trying several capitalists, they succeeded in interesting the Royal Bank of Canada at New York, one of whose managers, Bruce, had lived in Porto Rico. The claim of plaintiffs is that an arrangement was entered into on June 8 in writing, and defendant Juan Bianchi by cable obtained the concurrence of his associates in Porto Rico by which the Royal Bank of Canada upon the guaranty of Linares opened a credit with Bianchi, and the plaintiffs assisted Bianchi in going to Paris by way of Spain, which he otherwise could not have done, where he concluded the purchase of the property. The consideration to Linares, which he agreed to share with Luzunaris, was 10 per cent interest in the property.

The contract sought to be enforced was practically embraced in the two letters of June 8, as follows:—

Czarnikow Rionda Company,<br>
112 Wall Street,<br>
New York, June 8th, 1916.

Sr. Don Julian Linares,
  City.
Dear Sir and friend:—

"Central Coloso."

We beg to acknowledge receipt of your favor of yesterday, delivered to the undersigned, and besides our gratefulness for your assistance in this negotiation, I avail myself of this opportunity to thank you most heartily for your flattering phrases.

We also confirm the agreement with you to cede you a 10

Linares v. Rosafa.

per cent share in the business, if it is carried out, and in regard to the organization of the corporation, this will be dealt with, once that the business has been carried out.

With reference to the division of your share, we will be pleased to carry it out in accordance with your instructions, and we are glad that you have assigned 50 per cent, out of your 10 per cent, or one half thereof, to Mr. Manuel Luzunaris, for whom we also feel the highest regard.

Very truly yours and friends,

[Signed] Sucs. de Bianchi.

June 8th, 1916.

Sucesores de Bianchi,
Mayaguez, Porto Rico.
Dear Sirs and friends:—

I am pleased to confirm the negotiations with you, through your esteemed gentleman, and friend of mine, Don Juan Bianchi, relative to the purchase of the Central Coloso, in Porto Rico, with my co-operation, and so far as I am concerned, I stand ready to fulfil my obligations and carry through this negotiation, so skilfully conducted by Don Juan Bianchi, whom I congratulate on this opportunity.

Besides the sympathies which I feel for Don Juan, which reflect on you, I must sincerely confess that my participation in a negotiation of this nature in Porto Rico is due to my good wishes toward our friend Mr. Manuel Luzunaris, and in furtherance of this feeling I hereby grant and assign to said party 50 per cent of my profit on this business, consisting of 10 per cent on the profits of the Central Coloso, as heretofore agreed with Don Juan.

By virtue of this purchase, and for greater facility in fixing the legal requisites necessary, I would suggest that a corporation be organized here with a small nominal capital, and thus make the proper distribution of shares, prior to the transfer of the title and you may forward immediately to Don Juan a power of attorney, with sufficient powers, should he lack the same, provided my proposition be agreeable to you.

Yours truly,<br>[Signed] Julian Linares.

The guaranty of Linares so relied upon is as follows:—

Czarnikow Rionda Company,<br>112 Wall Street,<br>New York, June 9th, 1916.

Messrs. The Royal Bank of Canada,

New York, N. Y.

Dear Sirs:—

In accordance with the agreement and in order to be able to carry into effect the purchase of the Central Coloso, in Porto Rico, by Messrs. Sucesores de Bianchi, with my co-operation and with credit opened by you for $370,000 to meet the first payment, against collateral furnished by said parties, estimated worth $177,000 plus the sugars from said Central and the personal liability of the gentlemen who constitute said firm, I hereby guarantee you against actual loss in this transaction, and submit herewith my signature for the purpose, begging you to hold confidentially this guaranty and eliminate

my name in the course of the negotiations with said Messrs.
Sucesores de Bianchi.

Yours very truly,
[Signed] Julian Linares.

The bank contract was ratified by Bianchi to the bank as
follows:—

We are in receipt of your favor of the 8th, addressed to our
Mr. Juan Bianchi, and we confirm the deal closed between
him and you, as submitted to your Mr. McKenzie there. The
purchase of the Central Coloso, according to a cablegram re-
ceived by our Don Juan here, has been closed in Porto Rico,
but according to a later cable they are awaiting that the opera-
tion be confirmed by the vendors in Paris.

How far this was acted upon is one of the issues in the case.
The letter of McKenzie for the bank of June 8 says:—

The Royal Bank of Canada,
New York, June 8th, 1916.

Mr. Juan Bianchi,
New York City.
Dear Sir:—

With reference to our conversation we have received authority
to make you an advance of $370,000 to meet the first payment
on purchase of Central Coloso. It is our understanding that
this note will bear interest at the rate of 8 per cent and will be
signed by Sucs. de Bianchi and indorsed individually by
Francisco Bianchi, Juan Bianchi, and Miguel E. Blanes. As

security you will furnish various bonds estimated worth $177,-000, a contract for sugar of crop 1917–1918, and title deeds to the property subject to the lien guarantying deferred payments in favor of the former owners. Sugars to be sold through the Sugar Sales Corporation.

Yours very truly,

[Signed] C. E. McKenzie, Agent.

Agency of

The Royal Bank of Canada.

Incorporated 1869.

Supervisors Department,

New York, June 27th, 1916.

No. 2012.

The Manager,

San Juan.

Dear Sir:—

We wrote you last on · No. and have since received your letter of No. · Sucs. de Bianchi.

We are advised by Mr. Juan Bianchi that the credit authorized in favor of the above for the purchase of Central Coloso will not be required as the price at which Mr. Chas. Vere offered the ingenio was not confirmed by the owners in Paris. This credit is therefore canceled. Mr. Bianchi is nevertheless grateful for our proffered assistance.

Yours truly,

[Signed] J. Bruce,

Supervisor.

In October defendants obtained the assistance of the Royal Bank as follows:—

The Royal Bank of Canada.

Office of the General Manager.

Montreal, October 13, 1916.

No. 2291.

The Manager,

   San Juan.

Dear Sir:—

We wrote you last on     No.     and have since received your letter of     No.     Sucs. de Bianchi.

With reference to your letters Nos. 3653 and 3654 to the supervisor, our directors have to-day confirmed the following credit:

$500,000—Loans guaranteed by Juan Bianchi, Francisco Bianchi and Miguel Esteve, secured by various stocks and bonds, par value $295,000, lien on the crop of Central Coloso, and undertaking from the firm to give the bank a second mortgage on Central Coloso at any time we might desire it.

Revision date—July 1, 1917. Rate of interest 8 per cent. Sugars to be sold through the Sugar Sales Corporation.

We note that your recent correspondence does not mention a lien on the crop. This, however, was previously understood, and is a condition of the credit.

We should like you to obtain a statement of the firm's affairs at the first favorable opportunity.

Yours truly,

[Signed] C. E. Neill.

General Manager.

Linares v. Rosafa.

Defendants accordingly purchased Coloso for a million and a half dollars.

Defendants admit that there were negotiations of the character first named, but deny that they were ever consummated and deny any liability to plaintiffs in the matter, alleging that the purchase by them was due to the later arrangements to which plaintiffs were not parties.

Questions upon the testimony are discussed in the opinion.

*Messrs. Alvarez Nava* and *Dominguez* and *Miles N. Martin* for plaintiffs.

*Messrs. De Diego* and *Coll y Cuchi* for defendants.

HAMILTON, Judge, delivered the following opinion:

The points raised will be discussed in the order in which they have come up, and first those going to the jurisdiction of the court.

1. By the Act of Congress approved March 2, 1917, this court was given jurisdiction of all cases cognizable in the district courts of the United States between citizens of different states, domestic or foreign, where all parties on either side are citizens not domiciled in Porto Rico. Jones Act, § 41.. There are no presumptions in favor of the jurisdiction of Federal courts, and the facts upon which it rests must appear of record. Ex parte Smith, 94 U. S. 455, 24 L. ed. 165.

Plaintiff Luzunaris would seem to be a citizen of the United States not domiciled in Porto Rico, and the principal controversy is as to the Spanish citizenship of the plaintiff Linares. The Consulate General of Spain at New York shows that

Linares y. Rosafa.

in the registry of that consulate Linares is inscribed as a Spanish subject, native of Cicera, Santander, as per passport from the Spanish consul at Havana. This certificate is questioned on the grounds that it is not itself authenticated, and that the evidence upon which it rests is the statement of another consulate.

It is not important collaterally upon what evidence the foreign consul bases his certificate. He need not recite any of the proof made before him. It must very often happen that a council in one place must rely upon the records of a consul in another place. If the foreign nation, Spain in this instance, is satisfied with the proof of citizenship,—and that is not questioned,—it would seem that the domestic court trying the case should be equally satisfied. It is true that a domestic passport is not sufficient evidence of citizenship in a domestic court. Urtetiqui v. D'Arcy, 9 Pet. 692, 699, 9 L. ed. 276, 279. But this case rests upon the certificate of the Spanish consulate without regard to how that consulate obtained its information. It is true that there is nothing beyond its own seal to prove that this certificate was issued by the Spanish Consulate General at New York, and this court cannot know judicially foreign seals as it does those of domestic officials of the American government. This objection is well taken.

There was added, however, the certificate of the Spanish consul at Havana that said Linares is a Spanish subject, resident at Havana, and this certificate is certified by the American consul at Havana. It is quite true that a consul of the United States has the primary duty of authenticating commercial matters and acts in the state to which he is accredited, in the case at bar, Cuba. He cannot certify to facts outside his duties.

Stein v. Bowman, 13 Pet. 209, 10 L. ed. 129; Church v. Hubbart, 2 Cranch. 187, 2 L. ed. 249. A consul's powers are commercial and notarial. Rev. Stat. § 1750, Comp. Stat. § 3211, 3 Fed. Stat. Anno. 2d ed. p. 49; Bouvier's Law Dict. s. v. Consul; 45 L.R.A. 481. This does not authorize him to certify to the official character of a local notary. 1. Ops. Atty. Gen. 1. An American consul may be authorized to issue passports in foreign countries. Rev. Stat. § 4075, Comp. Stat. § 7623, 6 Fed. Stat. Anno. 2d. ed. p. 1266. By comity it might be presumed, in the absence of proof to the contrary, that a foreign consul acting under his official seal has a similar right, the more especially as his duties are for the protection of his citizens. This would be true of the consul supervising the commercial relations of the Spaniards in Cuba. The Cuban government could not certify that Linares was a Spaniard, and it is difficult to see what better proof outside of Spain, of Spanish citizenship, could be brought than the certificate of the Spanish consul with whom the record of citizenship is officially lodged. Considering the close relationship of consular officials it would not seem improper for him to certify to the official action of a brother consul, by international law officially discharging, like himself, commercial duties of a foreign nation at the same port. It does not seem to be going too far, therefore, to admit a certification by an American consul to such act of the Spanish consul.

2. Jurisdiction over specific performance of contracts is one of the most characteristic heads of equity jurisprudence. It was one of the civil law remedies devised by the pretor at Rome. The ordinary Roman procedure consisted in the reference of an issue shown in the formula to the judex for trial,

but as the judex, like the English juror afterwards, was a layman, in the course of legal development there arose in Rome, as later under the Edwards in England, classes of cases which had to be determined on direct trial, cognitio, by the pretor himself. At Rome in time this extraordinary jurisdiction became the usual jurisdiction of the pretors and the judices were dispensed with. The pretor's procedure was by interdictum, and was used for three purposes,—for restoration (interdictum restitutorium), production (exhibitorium), or prohibition (prohibitorium). Sohm, Inst. Roman Law, 308. Gaius describes it as ordering or prohibiting, aut jubet aliquid fieri, aut fieri prohibet. Gaius, Inst. IV. § 139. An instance of its application was in integrum restitutio.

There was a similar development in England, but with the difference that the triers of fact, jurors, continued in the common-law courts, and the corrective or equity system grew up in a new and independent jurisdiction in chancery. Specific performance was not only one of the most characteristic, but one of the earliest, heads of this equity jurisdiction. The court of chancery assumed its distinct form and acquired its full power under Edward III. and in the thirty-fifth year of that Monarch there is a case in which Lady Audley, without even joining her husband, sues her father-in-law for specific performance of covenants in a deed of settlement. Pom. Eq. Jur. § 35n. This particular remedy proved so useful that it has become one of the best recognized remedies of equity, and was never taken away in favor of courts of common law despite the long reaction against the ecclesiastical chancellors after the time of Henry VIII. Finally, Lord Hardwicke and Lord Eldon made

the principles of its enforcement a part of English and now of American jurisprudence.

3. The jurisdiction of this district court in specific performance has not been argued, but is a question which should be taken up by the court ex mero motu. This is not so much under Rev. Stat. § 723, Comp. Stat. § 1244, which is as follows: "Suits in equity shall not be sustained in either of the courts of the United States in any case where a plain, adequate, and complete remedy may be had at law."

Of course this section means something, and, if declaratory, must have been enacted to emphasize the usual rule. New York Guaranty Co. v. Memphis Water Co. 107 U. S. 205, 214, 27 L. ed. 484, 487, 2 Sup. Ct. Rep. 279. The statute only means that where there is a remedy at law,—meaning municipal law, whether common law or civil law, enforceable in the jurisdiction in question,—this must prevail to the exclusion of equity.

The question suggested arises rather out of the relation of Porto Rico itself of the United States. The Organic Act adopted March 2, 1917, declares in § 57 as follows: "That the laws and ordinances of Porto Rico now in force shall continue in force and effect, except as altered, amended, or modified herein, until altered, amended, or repealed by the legislative authority herein provided for Porto Rico or by Act of Congress of the United States; and such legislative authority shall have power, when not inconsistent with this act, by due enactment to amend, alter, modify, or repeal any law or ordinance, civil or criminal, continued in force by this act as it may from time to time see

XI. Porto Rico.—9.

Linares v. Rosafa.

fit." [39 Stat. at 968, chap. 145, Comp. Stat. § 3803 yy, Fed. Stat. Anno. Supp. 1918, p. 630.]

In Romeu v. Todd, 206 U. S. 358, 51 L. ed. 1093, 27 Sup. Ct. Rep. 724, the provision of the local mortgage law as to recording liens was declared to be paramount to the lis pendens rule in equity. Is there any similar local law as to specific performance?

The Spanish law had a triple origin,—Roman, Germanic, and Moorish. Harvard Law Review, February, 1917. Nevertheless the formal controlling element is Roman. The pretorian law as to interdicts came even more directly into Spanish codes than into the English law, and from the time of the Partidas Roman law has been very influential in Spain. The very word "interdicto" has been adopted, and the division into prohibitorio, restitutorio and exhibitorio is well known. Escriche, Dic. Raz., s.v. interdicto. The procedure was directly recognized in the Spanish Law of Civil Procedure, art. 482, and elsewhere. Some equity principles relating to fraud, rescission, and the like are directly adopted into the Spanish Civil Code and remain in the amended form of this work in force in Porto Rico. This was not the case with the interdict procedure, retained in its Roman form, which related primarily to keeping the public peace, and was applied to cases of restoring possession interrupted by force. The distinction between possession and title is one playing a great part in the history of law, whether of Rome, England, or Spain; but as far as the interdict procedure is concerned, the Spanish development was limited. The English remedy of specific performance seems to have grown out of the old interdict, but has developed into something more useful, like the modern injunction. Injunction against

violation is practically specific performance. Electric Lighting Co. v. Mobile & S. H. R. Co. 109 Ala. 190, 55 Am. St. Rep. 927, 19 So. 721. On the other hand, in Spain there does not seem to have been the same originality in expanding Roman procedure to meet modern needs. Probably modern needs did not exist in Spain, and so the natural conservatism of lawyers and courts did not need to be overcome. There was not, therefore, what we call specific performance in the Spanish law except as incidental to the interdict procedure, and even this gave way when in 1904 the American civil procedure was substituted in Porto Rico for the Spanish. There seems, therefore, to be no reason why this court cannot apply the remedy of specific performance in a proper case.

Even if the old Spanish procedure were in force, it would not be as adequate as equity. Equity was brought to Porto Rico through this court by military order 88, June 27, 1899. Laws and Orders Effective in Porto Rico, May 1, 1900, 2215. This is emphasized in the Organic Acts since, and cannot be regarded as affected by the readoption of the Spanish Civil Code in 1906, the more especially as that Code provides no method of enforcement of such matters, the interdict not being preserved. The practice which has grown up in this court, as for instance on removal, of re-stating the case in equitable form when equity is involved, is sanctioned by precedent and principle, and applies fully to specific performance.

4. The contract in question is based upon a letter of June 8 by the Sucesores de Bianchi to Linares, confirming the agreement to grant plaintiffs a 10 per cent share in the business, contemplating also the organization of a corporation. This letter

approves the granting of one half of the 10 per cent to plaintiff Luzunaris. Can it be enforced?

The tendency is now to restrict the remedy of specific performance. Willard v. Tayloe, 8 Wall. 557, 565, 19 L. ed. 501, 503. It is not necessary to raise objection by motion or demurrer because it is regarded as jurisdictional. Hipp v. Babin, 19 How. 271, 15 L. ed. 633; Allen v. Pullman's Palace Car Co. 139 U. S. 658, 35 L. ed. 303, 11 Sup. Ct. Rep. 682. The present argument is that the remedy of specific performance does not apply to personal property such as corporate stock. A contract for the purchase of chattels will not ordinarily be specifically ordered by a court of equity, because damages are adequate. Clarke v. White, 12 Pet. 178, 9 L. ed. 1046; 3 Pom. Eq. § 1402. The difference between chattels and realty is that chattels, unlike land, have not generally a value apart from their pecuniary value. But if chattels are unique, rare, or incapable of being reproduced by money damages, equity will decree specific delivery of them and specific performance of such contracts. 3 Pom. Eq. § 1402; Pom. Spec. Perf. §§ 11 and 12; Story, Eq. Jur. vol. 2, 13th ed. § 717. A typical case is a work of art such as a painting having a specific value. Dowling v. Betjemann, 2 Johns. & H. 554, 70 Eng. Reprint, 1178, 8 Jur. N. S. 538, 6 L. T. N. S. 512, 10 Week. Rep. 574; Pom. Spec. Perf. 17, note 2.

The test as to stock seems to be whether the securities are ordinarily purchasable in the market; contract as to government stocks and the like will not be enforced since they can always be bought. Pom. Eq. Jur. § 1402, note 2. Where stock is not easily purchased in the market, a contract may be specifically enforced. Johnson v. Brooks, 93 N. Y. 337. There is no evi-

dence that this stock was sold in the stock market; the inference is that the corporation was a private enterprise and its stock not for sale.

The claim is not for corporate stock per se, although the remedy lies for the issue of new stock where stock has been erroneously withheld or issued to another. Pom. Eq. Jur. § 1412. In the case at bar a large part of the property contracted for consisted of land, and it may be added that the court judicially knows it is impossible to carry on the business of a sugar central without interest of one kind or another in land, not only the site of the factory, but land or land contracts for securing the cane necessary to be ground. Moreover, this was during the prevalence of the Great War and sugar was at a premium. It might seriously be questioned whether the possible profits could readily be estimated in money, particularly at the time in question. A fair construction of the bill is that it seeks to enforce a contract for 10 per cent in Coloso as a going concern, embracing realty, business, and stock, or whatever other shape it might assume.

5. Specific performance is not only an equitable remedy, but it has peculiar features of its own. The contract to be enforced must be fair and for a valuable consideration, for a certain thing, and not relate merely to personal property, and the plaintiff must have performed his part or be ready to perform his part if anything is incumbent upon him. Derrick v. Monette, 73 Ala. 75; Gentry v. Rogers, 40 Ala. 442; Pom. Eq. Jur. § 1405. It is a substitute for damages where damages lie but are inadequate. Comer v. Bankhead, 70 Ala. 493. It does not follow that because rescission has been refused specific performance will be granted. There is a wide field between the two

remedies open for judicial discretion. The consideration must also have been paid and so much of the contract have been already performed that its rescission would be a fraud which could not be fully compensated by damages at law. Purcell v. Minor (Purcell v. Coleman) 4 Wall. 513, 18 L. ed. 435. Specific performance will not be decreed unless it is clearly shown that the contract is completed, that its terms are fair, and so definite and certain that they cannot be reasonably misunderstood. Kane v. Luckman, 131 Fed. 609, 612. From the time of Lord Hardwicke it has been the established rule that a court of chancery will not decree specific performance unless the agreement is certain, fair, and just in all its parts. He declared this the most useful head of chancery jurisdiction. Walker, Am. Law, 700.

6. Specific performance is not only one of the principal heads of equity jurisprudence, but the procedure to enforce it has some features peculiar to this remedy. It will not be decreed if it is doubtful whether an agreement has been concluded or is still in negotiation, nor unless the proof is clear and satisfactory, both as to the existence of the agreement and as to its terms. Dalzell v. Dueber Watch Case Mfg. Co. 149 U. S. 315, 37 L. ed. 749, 13 Sup. Ct. Rep. 886. As to the proceedings, great accuracy of averment and also of proof is required. Clark v. Snodgrass, 66 Ala. 233; Lewis v. Lee County, 66 Ala. 482. It has been said that the jurisdiction is discretionary, but this should rather be expressed as requiring the case to be clearly proved. If the proper case arise, it is as much a matter of course for a court of equity to decree specific performance as for a court of law to award a judgment for damages. Pom. Eq. Jur. § 1404. It is true, however, that the principle is governed by the cir-

Linares v. Rosafa.

cumstances of each particular case. McBryde v. Sayre, 86 Ala. 458, 3 L.R.A. 861, 5 So. 791. The rule as to accuracy of proof is probably not different from that required in other equitable remedies. From the origin and nature of equity the court has endeavored to sift the conscience of the defendant. Discovery has been ingrafted upon law by legislation, but discovery was originally the fundamental remedy in equity procedure. Moreover, no bill could be enforced except upon the testimony of two witnesses, or, as afterwards modified, one witness with corroborating circumstances. Adams, Eq. 21, and notes. Equity did not otherwise, however, develop a separate system of evidence from common law, and acts upon the ordinary rules of evidence. If specific performance requires clearer proof than other cases in equity, it is not because of its relative importance, but because the contract to be enforced must generally be got at from circumstances, and circumstantial evidence to be convincing must be clearer than direct evidence. In the case at bar the contract was in writing and hence is not subject to doubt, unless as to what is the full meaning of the words employed. So far as the nature of the case at bar is concerned, there is no doubt as to the applicability of the remedy.

7. A good many objections were made to the admissibility of depositions on the ground that they were not properly certified by the notary taking them. It is almost impossible to pass properly upon this point. The depositions were taken in Spanish under stipulation of counsel, with the understanding that they should be translated after they reached court, on account of lack of time for that purpose when they were taken. After being filed generally, they were, by consent of the parties, taken apart in open court and delivered to the official interpreter for

translation.    They should have been officially refastened to-
gether in the same order and form in which they were filed, but
this was not done.   By ocular examination the court is satisfied
that the depositions objected to were those so filed and so taken
apart by consent.   It seems best, therefore, to overrule the ob-
jections based upon this point, and to consider only those which
relate to particular statements in the respective depositions.

As to these, however, it is not perceived on re-examination
that any material error was made as to evidence admitted or
rejected.   It is difficult to be sure of each separate question or
answer, but all that seemed to bear on the issues of the case was
admitted, and neither party has been injured.   Either through
the letters and papers themselves, or references made to the
transactions by the parties who are witnesses, sufficient can be
made out to understand what occurred and justify the conclu-
sions now reached.

8. There seems to be no reasonable doubt as to the execu-
tion of the contract at bar and as to the fact that for six days
the letter of plaintiff Linares was in the hands of the Royal
Bank of Canada, as well as that plaintiff Luzunaris did a good
deal of work for the defendants in New York and in securing
the passage of Juan Bianchi to Spain.   It seems also to be
shown that there was a consideration of $6,000 agreed upon
between Bianchi and Luzunaris for his services, and no com-
plaint is made of its nonpayment.   It must be assumed, there-
fore, that this particular matter is not at issue.   What is at issue
is as to whether the guaranty of Linares, in which Luzunaris
was to share, became an executed contract.

The evidence is conflicting and far from satisfactory.   That
of the plaintiffs themselves is indefinite, and it cannot be said

Linares v. Rosafa.

that the defense made by the defendants, that plaintiff acted fraudulently, misrepresenting the necessity for the guaranty by Linares, is made out. Nor is it clear that the subsequent transaction by which the defendants bought the Central Coloso did not grow out of the original deal. The defense was not satisfactory on these points.

On the other hand the plaintiffs' evidence is that the guaranty of Linares, which was the consideration for the alleged cession, was acted upon by the Royal Bank of Canada, and such action is a prerequisite of the plaintiff's case. The Royal Bank of Canada was the institution which furnished the money that bought the property, and the 10 per cent claim of the plaintiffs is based upon Linares's guaranty being the consideration upon which the Royal Bank of Canada made the advance. But the two managers of the bank say that the guaranty of Linares was not relied on. McKenzie knows nothing at all about Linares facilitating the transaction; Bruce, the active manager in this transaction, knew Linares, but distinctly states that Linares's guaranty was not considered by the bank at all. Linares had requested the bank to leave him out as soon as possible, and the conviction is forced upon the mind by the testimony of the bank officials active in the matter that they left him out from the beginning. The contention of plaintiffs is that the recollection of these officials is at fault and that their testimony is a mistake, but the court cannot adopt this view. If the bank acted on the guaranty, plaintiffs' case is made out, and the best, if not only good, evidence on this point must be that of the bank, and the bank says the guaranty was not considered. Plaintiffs cannot know more on this crucial point than the bank itself. The bank's officials could hardly

recollect all the rest of the transaction and forget this, and moreover the contemporary messages to the head office in Montreal, which was really the bank, contain no reference to Linares. It is indeed shown that in June defendants understood the assistance of Linares was needed, and agreed to convey to him one-tenth interest in the purchase, and it is not shown that this agreement was obtained by fraud. But it is also satisfactorily shown that the assistance of Linares was not used, and that the proposed purchase was not effected. It is quite true that the defendants purchased Coloso and that the bank aided them, but it was in October, and Linares's guaranty had nothing to do with the transaction. The present suit is not a case of quantum meruit, but one for enforcement of a specific contract. The plaintiffs have not only not clearly proved their claim, but the preponderance of the evidence does not favor them.

It follows that the plaintiffs cannot be said to have made out their claim for the specific performance of the contract in controversy to the certainty which is required in equity, and relief must be denied.

The bill will be dismissed.

It is so ordered.